Roger **ATTAKAI**, et al., Plaintiffs,

v.

**UNITED STATES**, et al., Defendants.

**No. CIV 88–964 PCT EHC.**

United States District Court,
D. Arizona.

Feb. 28, 1990.

Lee Brooke Phillips, Big Mountain Legal Office, Flagstaff, Ariz., for plaintiffs.

Steven Carroll, Atty., Dept. of Justice, Land & Natural Resources Div., Indian Resources Section, Washington, D.C., for defendants.

## OPINION AND ORDER RE APPLICATION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS

CARROLL, District Judge.

Defendants, officials of the United States Department of the Interior (DOI) and the Bureau of Indian Affairs (BIA), are involved in construction of fences and livestock watering facilities on portions of the Hopi Indian Reservation as part of a range restoration and management program. Plaintiffs, individual members of the Navajo Tribe, filed this action on behalf of a class of all members of the Navajo Tribe who practice the traditional Navajo religion, seeking to enjoin defendants from continuing current and proposed fencing and construction projects on the Hopi Reservation. The case has not been certified as a class action.

Plaintiffs, who continue to reside upon or use the land in the vicinity of the projects, allege that the construction activities are interfering with their ability to practice their religion, in violation of the Free Exercise Clause of the First Amendment and the American Indian Religious Freedom Act, and are irreparably disturbing and destroying sites and objects of religious, historical, and archaeological significance in violation of the National Historic Preservation Act, the Historic and Archaeological Data Preservation Act, the Archaeological Resources Protection Act, the National Environmental Policy Act and the Administrative Procedure Act.

## BACKGROUND

This action arises out of the long-standing dispute between the Hopi and Navajo

Tribes over title and interest in reservation lands in northeastern Arizona. The construction activities involved in this action affect a portion of the 1882 Executive Order Reservation established for use by the Hopi Indians and "such other Indians as the Secretary of the Interior may see fit to settle thereon," which became a Joint Use Area (JUA) of the Navajo and Hopi Tribes as a result of the decision in *Healing v. Jones,* 210 F.Supp. 125 (D.Ariz.1962), *affirmed per curiam,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1962). The specific portions of the JUA involved in this action were subsequently partitioned to the Hopi Tribe on April 18, 1979 pursuant to provisions of the Navajo–Hopi Land Settlement Act, Pub.L. 93–531, 25 U.S.C. § 640d *et seq.* See *Sekaquaptewa v. MacDonald,* 575 F.2d 239 (9th Cir.1978); *Sekaquaptewa v. MacDonald,* 626 F.2d 113 (9th Cir.1980).

The Settlement Act, as amended by the Navajo and Hopi Indian Relocation Amendments Act of 1980, Pub.L. 96–305, provides for the relocation of members of one tribe residing on lands partitioned to the other tribe. The plaintiffs in this action continue to use portions of the land partitioned to the Hopi Tribe (Hopi Partitioned Lands or HPL) near their residences. Most of the plaintiffs continue to reside on the HPL in the vicinity of the construction projects and are subject to relocation from the HPL.

The construction activities of which plaintiffs complain are part of an ongoing range restoration and management program throughout the HPL required by Court Orders and the Settlement Act.[1] The particular construction projects which are the subject of this action involve separate projects in two different parts of the HPL. The first involves the construction of fences to restrict livestock movements in Range Unit 562, in the vicinity of Star Mountain. This fencing project includes three fence lines, one of which stops at the base of Star

Mountain, one which continues about halfway up the mountain, and a third which would rise to near the top of the mountain. The second project involves the construction of a pipeline and earthen stock tank to provide a watering facility for livestock in Range Unit 257. Both projects are funded by defendants, but have been approved by the Hopi Tribe and are actually being accomplished by the Hopi Tribe through contracts with defendants pursuant to the Indian Self Determination Act.

At the hearing on the Motion for a Preliminary Injunction the Court recommended that the defendants provide seven days notice of proposed projects on the HPL to the Navajo Tribe and plaintiffs to reduce tensions and the possibilities for conflict in the area while this matter was being considered. The defendants agreed to provide such notice.

Defendants have filed a motion to dismiss the complaint on various procedural grounds and for failure to state claims.

The Court has reviewed the briefs relating to the Application for a Preliminary Injunction and the Motion to Dismiss, the evidence presented at the hearing, and documents incorporated into this action from a related action before this Court, *Manybeads v. United States,* 730 F.Supp. 1515 (D.Ariz.) (Order of Dismissal filed October 20, 1989). This order will address plaintiffs' Motion for a Preliminary Injunction and the defendants' Motion to Dismiss.

## I. STANDING

In their Motion to Dismiss, defendants contend that plaintiffs, as individual members of the Navajo Tribe, are not the proper parties to assert the claims in the complaint, because Congress intended in both

---

1. The restoration project began in 1972 when the Court, in response to a request for a Writ of Assistance from the Hopi Tribe to enforce the Hopi rights to equal use of the JUA, ordered the Secretary of the Interior to begin range restoration and conservation measures on the JUA, which was at that time found to be severely overgrazed by the more populous Navajos. In

1974, Congress specifically directed the Secretary to restore the grazing potential of the former JUA to the "maximum extent feasible." 25 U.S.C. § 640d–18(a). In the 1980 amendments, Congress further directed that conservation activities be conducted with the concurrence of the Tribe to which the particular land was partitioned. 25 U.S.C. § 640d–9(e)(1)(A).

the 1958 Act[2] and Settlement Act to foreclose litigation by individual members of the tribes concerning the land dispute, having determined that the interests involved were tribal and should be represented by the Chairmen of the respective tribal councils.

This issue as to the standing of individuals to assert claims related to the inter-tribal land dispute has been addressed in various circumstances, (including a Constitutional Due Process claim), by both the District Court and Ninth Circuit Court of Appeals on several occasions. See *United States v. Kabinto*, 456 F.2d 1087 (9th Cir. 1972); *Sekaquaptewa v. MacDonald*, 544 F.2d 396 (9th Cir.1976); *Sekaquaptewa v. MacDonald*, 591 F.2d 1289 (9th Cir.1979); *Sidney v. MacDonald*, 536 F.Supp. 420 (D.Ariz.1982), *aff'd Sidney v. Zah*, 718 F.2d 1453 (9th Cir.1983). The clear conclusion of these cases is that Congress intended to foreclose participation by individuals in the inter-tribal land dispute, in order to prevent duplicative and protracted litigation and to provide a more expeditious and fair resolution of the dispute.

Although the prior cases have all involved claims principally related to land interests, the cases and legislative history indicate that the bar to private actions in the statute was intended to be broad, covering actions related to the Navajo–Hopi dispute and tending to delay its resolution. Accordingly, this Court has found that individual Navajos do not have standing to challenge both the denial of grazing permits associated with the conservation program, and procedures associated with the Relocation Program.[3] However, individuals do have standing to bring suit concerning decisions affecting their own eligibility for relocation benefits under the Act. See *Walker v. Navajo–Hopi Indian Relocation Commission*, 728 F.2d 1276 (9th Cir. 1984), *cert. denied*, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *Bedoni v. Navajo–Hopi Indian Relocation Commis-*

*sion*, 878 F.2d 1119, 1120 (9th Cir.1989); *Begay v. United States*, 865 F.2d 230 (Fed. Cir.1988).

The activities which plaintiffs seek to enjoin in this case are being carried out pursuant to section 18(a) of the Settlement Act and relate to restoration of lands partitioned to the Hopi Tribe which were overgrazed in the past by Navajo herds. Thus, defendants contend that plaintiffs lack standing to assert their claims. Plaintiffs argue that while the standing limitation may be valid as directed at rights derivative of tribal membership, such as property rights, it cannot bar individual causes of action for abridgement of fundamental personal rights and liberties.

### A. Statutory Claims

As to the claims based on violations of federal statutes, the government has not specifically argued that the individual plaintiffs in this action do not have standing to bring an action under these statutes. The interests that individuals may have in the preservation of historical, archaeological and cultural artifacts are not necessarily the same as those of the Tribe in all instances, and such claims are not sufficiently related to the inter-tribal land dispute that the standing limitation is applicable.

### B. Free Exercise Claims

As to the Free Exercise claims, the standing issue is more complex. In these proceedings the parties have drawn a distinction between "tribal" religious sites, those which are generally identified and more widely known and which have significance to the tribe, (i.e., Star Mountain), "regional" (local) sites, those which are known and have significance to persons residing in a particular area, (i.e., a special ceremonial site), and "individual" sites, those which are known and therefore have significance only to individual members of

---

**2.** Act of July 22, 1958, Pub.L. 85–547, 72 Stat. 403, authorizing the Chairmen of the Navajo and Hopi Tribes to commence an action for the purpose of determining the interests of the

tribes in the 1882 Executive Order Reservation, and quieting title to such lands in the tribes.

**3.** *Zee v. Watt*, CIV 83–200 PCT EHC; *Benally v. Hodel*, CIV 86–912 PCT EHC.

the tribe, (i.e., a burial site of an ancestor). As to each of these types of sites, the plaintiffs' claims encompass allegations that the free exercise of plaintiffs' religion is infringed because the construction is destroying the particular sites, and denying them access to the sites.

### 1. Sites of Significance to Individuals

■ As to the individual sites, the plaintiffs' claims are based on alleged violations of their individual constitutional rights. Further, these claims, relating to sites with significance only to individual members of the Tribe, cannot be considered "tribal" interests, as, for example, property or grazing rights, such that these interests can be properly represented by the respective tribal Chairmen. Thus, the standing limitation in the Settlement Act is not applicable to these particular claims. Accordingly, the general requirements for standing being satisfied, the plaintiffs have standing to assert claims regarding sites having individual interest; as well as local sites having significance to persons residing in a particular community.

Although the Navajo Tribe presented similar evidence relating to interference with the free exercise rights of individual members of the tribe in the prior partition proceedings in this case in seeking to avoid any relocation of Navajos, the claims of these individuals were not litigated and were not necessarily sufficiently related to the inter-tribal dispute such that application of the doctrines of res judicata or collateral estoppel is controlling.

### 2. Shrines of Significance to the Tribe

■ In regard to the tribal sites or shrines, such as Star Mountain, the standing issue requires more detailed analysis. Although plaintiffs' complaint alleges that the construction projects are destroying these tribal sites, in testimony and at argument it became clear that the claim extends to or encompasses allegations that the plaintiffs' free exercise rights are being violated in that the construction is resulting in a denial of access to these sites. Indeed, since the interference occurring at Star Mountain is fence construction, in es-sence, the primary allegation as to this site is denial of access for religious purposes.

The significance of various tribal religious sites or shrines to the tribes and the importance of title and access to these shrines has been a primary consideration for both the Court and Congress throughout the land dispute litigation. Several provisions of the Settlement Act gave effect to the Congressional concern in assuring that religious shrines of each tribe were considered in the resolution of the dispute.

In the Settlement Act, Congress provided for negotiation between the tribes to resolve the remaining disputes over use of the JUA, and upon failure of negotiation, section 640d–5 provided for a mediator to study the issues and make a recommendation to the District Court. As one of the issues to be considered by the mediator, section 640d–5(c) specifically provided that "In any division of the surface rights to the joint use area, reasonable provision shall be made for the use and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access is for religious purposes." Further, section 640d–20 imposes upon the Secretary the duty to "make reasonable provision for the use and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access are for religious purposes."

Accordingly, the issue of religious shrines received attention in the preparation of the mediator's report and in the subsequent partition proceedings. After submission of the mediator's report, the District Court conducted an evidentiary hearing on partition. At that hearing, the Navajo Tribe presented evidence of the impact of partition and relocation on the Navajo religion, and, as it has here, the attachment of individuals to the land and its importance to the individual's religious practices. The issue received further attention in post hearing briefing, when the tribes submitted lists and descriptions of identified religious shrines under seal. The

Navajo list identified 81 Navajo religious shrines on the former JUA, including Star Mountain.

It is clear that Congress recognized the significance of certain religious shrines to each tribe, and intended that these tribal interests be considered in the context of the inter-tribal land dispute. The Act contained provisions to implement Congressional intentions, both during partition and until implementation of the final resolution of the dispute. The record in this proceeding demonstrates that the impact of partition on these tribal shrines and on religious practices received substantial consideration in the prior decisions which would affect these sites.

Accordingly, the Court finds that individual members of the respective tribes do not have standing to bring actions involving denial of access or interference with Tribal religious shrines. Congress found that these interests were tied to the tribal land interests, intended that such matters be resolved in the context of that litigation between the tribal Chairmen, and provided means to ensure that these rights were protected. While the two tribes have generally been unable to negotiate resolutions of issues relating to the land dispute without litigation, the two tribes have a history of working out religious access problems. This pattern has continued in the post-partition years and there has been no prior Court orders concerning disputes over religious access. There is no apparent reason why such cooperation will not resolve any issues concerning access to or interference with Star Mountain. Should judicial proceedings become necessary to resolve such matters, Congress has determined that the Tribal Chairmen are the proper parties to litigate these claims on behalf of all members of the tribe.

For the reasons stated above, the defendants' motion to dismiss claims relating to denial of access or interference with Tribal

religious shrines (i.e. Star Mountain) will be granted.[4]

## II. PRELIMINARY INJUNCTION AND MOTION TO DISMISS

In the Ninth Circuit, the criteria for granting a preliminary injunction requires plaintiffs to establish either: 1) a combination of probable success on the merits and possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173 (9th Cir. 1989).

The claims asserted by plaintiffs in support of their request for a preliminary injunction do not specifically include their equal protection and breach of fiduciary duty claims alleged in the complaint, although these claims were occasionally raised in argument or examination. However, based on a review of the record in regard to these claims, the Court finds that plaintiffs' have not made the necessary showing to obtain a preliminary injunction on the basis of these claims. The remaining claims will be discussed separately.

### A. *Free Exercise Clause/AIRFA*

Plaintiffs principal claim is that the defendants' activities will interfere with the practice of their religion and constitute a violation of the free exercise clause of the First Amendment and the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996.

Plaintiffs' memorandum in support of a preliminary injunction describes at great length the nature and practices of Indian religions, and the traditional Navajo, or "Dineh" religion in particular. (Plaintiffs' Memorandum at pp. 3–15). Plaintiffs explain that their religion does not have a set of doctrines or dogma, but rather perpetuates a set of rituals and ceremonies which must be conducted, both in the same manner and the same place, as prescribed in the

---

**4.** To the extent that plaintiffs' broad complaint may include any cognizable individual claims for First Amendment free exercise clause violations as to these sites, the later discussion and conclusions as to plaintiffs' claims regarding individual (and so-called "regional" (local) sites is equally applicable to such claims.

originating revelation. (Pl. at 9). Essentially, sacredness attaches to places, which are believed to be portals to the spiritual beings. Individuals must have access to these sites to conduct the various rituals, and fulfill their obligations to care for the land entrusted to them by the creators. (Pl. at 11). Therefore, it is alleged that destruction or desecration of these sites through fencing and construction projects prevents plaintiffs from fulfilling their caretaking responsibilities and interferes with the rituals, thereby preventing the practice of their religion.

### 1. First Amendment

■ As to the threshold issues in a First Amendment free exercise claim, the defendants do not dispute for purposes of this motion that plaintiffs practices are based on a sincerely held bona fide religious belief. Similarly, there is no dispute that the construction projects would seriously interfere with or impair some of the plaintiffs' religious practices.

The United States Supreme Court has recently addressed the issues raised by plaintiffs in *Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). The Supreme Court's decision in *Lyng* provides direct and dispositive answers to plaintiffs' First Amendment claims, and is the basis of the defendants' motion to dismiss these claims.

The principal issue in *Lyng* was whether the Free Exercise Clause prevented the government from constructing a road through a portion of a National Park "that has traditionally been used for religious purposes by members of three American Indian Tribes." The Court concluded that the Free Exercise Clause neither restrained the government in such instance nor required it to demonstrate a compelling need to use its property for building a road in the manner contemplated:

The Free Exercise clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens....

... The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.

108 S.Ct., at 1325, quoting *Bowen v. Roy*, 476 U.S. 693, at 699–700, 106 S.Ct. 2147, at 2152, 90 L.Ed.2d 735 (1986).

■ The fact that a person's ability to practice their religion will be virtually destroyed by a governmental program does not allow them to impose a religious servitude on the property of the government, much less property which the government holds in trust for another sovereign Indian tribe. As held in *Lyng:*

Even if we assume that we should accept the Ninth Circuit's prediction, according to which the G–O road will 'virtually destroy the Indians' ability to practice their religion,' [*Northwest Indian Cemetery Protective Ass'n. v. Peterson* ] 795 F.2d [688], at 693 [ (1986) ] (opinion below), the Constitution simply does not provide a principle that could justify upholding respondents' legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent it is feasible, is

for the legislatures and other institutions.

108 S.Ct., at 1326–27.

The plaintiffs' claims in the instant case are no more compelling than the unsuccessful claim in *Lyng*. In *Lyng*, the activity the Indians sought to prevent was occurring on public land. Here, the land is part of the HPL, the interests to which have been declared to be in a third party—the Hopi Tribe. The rights claimed by plaintiffs in Hopi lands are in total derogation of Hopi rights in and to their reservation. These rights have been established through litigation specifically authorized by Congress, pursuant to legislation specifically enacted for the purpose of resolving the dispute over the respective interests.

In *Lyng*, the Court further stated that "[n]othing in our opinion should be read to encourage governmental insensitivity to the religious needs of any citizen. The Government's rights to the use of its own land, for example, need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents." 108 S.Ct., at 1327–28. The Court emphasized that the government had taken steps to minimize the impact of the construction on the Indian's religious activities.

Plaintiffs' First Amendment claims here include an allegation that construction projects should not occur without consultation with plaintiffs. However, the projects involved in *Lyng* involved construction of a road on public lands. The projects involved here relate to statutorily mandated range restoration, conservation and management programs for the Hopi Tribe on what is now part of the Hopi Reservation. Thus, while the government may have certain responsibilities to consider the impact of projects on public lands on the Indian's religious practices, the same responsibilities cannot be imposed on the Hopi Tribe's rights to possess and use its reservation, or on the government in carrying out projects for the benefit of the Hopi Tribe on the Hopi Reservation pursuant to specific Congressional authorization. The Supreme Court recognized these limitations in discussing the reasonableness of its Constitutional holding, noting that the potential practical effects of an extension of the Constitution to encompass the Indian's claims would create a religious servitude and corresponding diminution of property rights, subsidy of the Indian religion, and could easily require de facto beneficial ownership of the subject lands. Whatever rights the Indians may have to use of the area, those rights do not divest the Government (or Hopi Tribe) of its right to use what is, after all, its land. 108 S.Ct., at 1327.

*Lyng* does recognize the rights of the Indians in certain circumstances to use an area for religious purposes, and notes that a law forbidding such access on *government* lands would raise a different set of constitutional questions.

As discussed previously, the Settlement Act guarantees access to religious shrines on the reservation of the other tribe and imposes on the Secretary the duty to protect that access. However, access in terms of the right to physically visit and use those sites is not an issue here. There has been no evidence that the government, or Hopi Tribe, has denied the plaintiffs' the right to physically visit or use any of those shrines or the other sites involved in this action. Neither the Settlement Act nor the Constitution provide plaintiffs' the right to have access to sites personal to them in perpetuity, or in the manner most acceptable or desireable to plaintiffs. See *Manybeads v. United States*, 730 F.Supp. 1515 (D.Ariz.1989).

Accordingly, plaintiffs have failed to state a constitutional free exercise claim and the government's motion to dismiss this claim (Count I) will be granted.

## 2. AIRFA

Plaintiffs' primary free exercise claim is based on the First Amendment, as the bulk of their argument suggests. However, plaintiffs also claim that the construction activities violate the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996.

AIRFA states that it shall be the policy of the United States to protect and preserve for American Indians their right

of freedom to believe, express and exercise their traditional religions, including access to sites and use and possession of sacred objects. The legislative history provides that the Act was meant to insure that American Indians were given the protection guaranteed under the First Amendment to all persons, not to grant them rights in excess of those guarantees. *Crow v. Gullet,* 541 F.Supp. 785 (D.S.D. 1982), *aff'd,* 706 F.2d 856 (8th Cir.1983), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983). In *Crow,* the Court determined that the Act is merely a statement of policy, does not require anything more than the First Amendment, and further, does not create a cause of action in federal courts for violations of religious freedoms. 541 F.Supp. at 793–94. *Lyng* also addressed and rejected contentions similar to those asserted by plaintiffs here, i.e., that their interpretation of the First Amendment was enacted into statutory law. The Court noted: "Nowhere in the law is there so much as a hint of any intent to create a cause of action or any judicially enforceable individual rights." 108 S.Ct. at 1328. Accordingly, plaintiffs do not have any individual claim under AIRFA. The government's motion to dismiss this claim (Count II) will be granted.

## B. *National Historic Preservation Act (NHPA)*

Plaintiffs allege that prior to construction on these projects, defendants did not (1) engage in consultation with the State Historic Preservation Officer and Advisory Council on Historic Preservation in either the decision making process or implementation of the range management projects as required by sections 106 and 110 of the National Historic Preservation Act, 16 U.S.C. §§ 470f and 470h–2, Executive Order 11593, and the applicable regulations, and (2) did not provide the Advisory Council a reasonable opportunity to comment. A substantial portion of the testimony and argument at the preliminary injunction hearing related to the parties' interpretations of what procedures are required by

law, and what the government actually did in regard to compliance with these requirements for the specific construction projects at issue.

### 1. Section 106

■ Section 106 of the NHPA provides that the head of any federal agency having jurisdiction over a federally assisted undertaking, shall, prior to approval of the expenditure of funds or issuance of a license, take into account the effect of the undertaking on any site or object included in or eligible for inclusion in the National Register and shall provide the Advisory Council on Historic Preservation a reasonable opportunity to comment with regard to the undertaking. See 16 U.S.C. § 470f. The Advisory Council has established regulations for federal agencies in regard to compliance with Section 106. See 36 CFR Part 800 (1987).[5] The process established by the regulations is designed to accommodate historic preservation concerns and the needs of federal undertakings, principally through consultation among the Agency Official, the State Historic Preservation Officer (SHPO), the Advisory Council and other interested persons, to provide efficient identification and adequate consideration of historic properties. § 800.1(b).

The section 106 process, set out in sections 800.4 through 800.6 of the regulations, consists of the identification of historic properties which may be affected by the federal undertaking, an assessment of the historical significance of the property, a determination of whether there will be an adverse effect on the property, consideration of ways to reduce or avoid any adverse effect on such historic property, and review and comment by the Advisory Council on the procedures and conclusions of the Agency Official and SHPO. Under this regulatory scheme, formal consideration of adverse effects and ways to avoid or reduce these effects is required for an undertaking which affects "historic properties", defined as properties included in or which meet the criteria and are eligible for inclu-

5. All subsequent references herein to the regulations are to 36 CFR Part 800 (1987) unless otherwise specified.

sion in the National Register of Historic Places. § 800.2(e). Accordingly, the initial steps in the process, the identification of historic properties that may be affected and the determination of the eligibility of these properties for inclusion in the National Register, is of considerable importance, and is the focus of the violations alleged by plaintiffs.

Section 800.4 sets out the procedures for identification of historic properties and evaluation of eligibility for inclusion in the National Register. Paragraph (a) provides that the Agency Official "shall": (i) review existing information on historic properties potentially affected by the undertaking; (ii) request the views of the SHPO on further actions to identify historic properties which may be affected; and (iii) seek information in accordance with agency planning processes from local governments, Indian tribes, and other parties likely to have knowledge of or concerns with historic properties in the area. On the basis of this information, the Agency Official is to determine the need for further actions to identify historic properties, such as field surveys. § 800.4(a)(2). In consultation with the SHPO, the Agency Official is required to make a reasonable and good faith effort to identify historic properties which may be affected, and gather sufficient information to evaluate the eligibility of these properties for inclusion in the National Register. § 800.4(b). Paragraph (c) provides that in consultation with the SHPO, the Agency Official shall apply the National Register Criteria to these properties and make a determination as to eligibility for inclusion in the National Register. "If the Agency Official determines in accordance with paragraphs (a) through (c) that there are no historic properties that may be affected by the undertaking, the Agency Official shall provide documentation of this finding to the SHPO," and no further steps are required in the section 106 process. § 800.4(d). If the Agency Official determines that there are historic properties that may be affected, the effects are to be assessed in accordance with section 800.5.

■ Plaintiffs' principal claim is that the defendants did not engage in consultation with the SHPO in determining the exist-

ence of historic properties as required by section 800.4 of the regulations. Defendants contend that they substantially complied with the implementing regulations, and determined that there were no properties which meet the criteria for inclusion in the National Register which would be affected by the projects.

In regard to the procedures actually followed by the BIA as to section 106 compliance on these projects, the Court heard testimony from the BIA Range Conservationist, the Area Archaeologist for the Phoenix Area Office of the BIA, who is responsible for compliance with section 106, and a Soil Technician from the BIA Hopi Agency who now conducts section 106 surveys on the HPL and oversees construction with regard to historic preservation concerns after archaeological clearance. The evidence shows that the following occurred with respect to compliance with section 106 on the undertakings at issue.

In attempting to identify historic properties which might be affected by the projects, none of the procedures described in section 800.4(a)(1) of the regulations were followed. The testimony indicated that such procedures are rarely if ever utilized by the BIA Phoenix Area Office. Rather, the standard practice of the Phoenix office is to complete a field survey on each project prior to archaeological clearance and final approval, purportedly pursuant to section 800.4(a)(2) of the regulations. The survey consists of a walkover of the entire project line, which has been surveyed and staked prior to this section 106 survey, to inspect the area for cultural or archaeological remains which lie in the project line, or sufficiently close that incidental impact might be expected.

Field surveys were completed for both projects involved in this action. In 1986, the Area Archaeologist, accompanied by the Soil Technician of the Hopi Agency surveyed the proposed locations for the pipeline and earthen stock tank in Range Unit 257. In April 1988, the Soil Technician surveyed the proposed fence lines in Range Unit 562. In each project, potential historic properties were located and, pursu-

ant to standard practice of the Phoenix office, the Soil Technician and Area Archaeologist recommended that portions of the projects be moved to new alignments to avoid any potential effect on the resources. New alignments were proposed and incorporated into the project.

Based on the realignment of the project away from the cultural or archaeological remains a sufficient distance to satisfy the Area Archaeologist that there would be no effect, the Area Director determined that the project would have no effect, and issued archaeological clearance for both projects. Although the Area Archaeologist further testified that it is the standard practice of the Phoenix office to then send documentation of the "no effect" or no properties finding to the SHPO in the form of a copy of the archaeological clearance from the Director to the Superintendent, the testimony and records of the SHPO do not show that this was done on either project in this instance.

Plaintiffs argue that these procedures violate the Act and regulations in several respects. First, plaintiffs assert that consultation with the SHPO is required by section 800.4(a)(1). It is clear that there was no consultation between the SHPO and Agency in any manner. Section 800.4(a)(1) states that the agency official shall consult with the SHPO in assessing information needs to identify historic properties which may be affected. Defendants contend however, that section 800.4(a)(2) reflects that the purpose of section 800.4(a)(1) and the consultation is to determine the need for a survey of the area. Defendants therefore contend that since they conducted a survey, they are in substantial compliance with section 800.4(a). The Court disagrees.

Section 800.4(a)(2) states that based on the information gathered through consultation and the procedures in paragraph (a), the Agency Official is to determine the need for further actions, *such as* surveys or predictive modeling. Without consultation with the SHPO or reference to other available information, the Agency Official has no reasonable basis under the regulations to determine what additional investigation aside from a survey may be war-

ranted, or the reasonable scope of the survey. Paragraph (b) requires the agency official to make a reasonable and good faith effort to identify historical properties, in consultation with the SHPO. Thus, the regulations clearly require consultation with the SHPO. The procedures of the Phoenix Area Office in this instance were not sufficient under paragraphs (a) or (b) of section 800.4.

Nevertheless, defendants contend that they substantially complied with the regulations by moving the projects away from any cultural or historical resources in the project areas, permitting a determination by the Agency Official that there are no historic properties that will be affected by the undertaking. The defendants argument in this regard is based on section 800.3(b) of the regulations, which provides that they may be implemented by the Agency Official in a flexible manner reflecting differing program requirements, as long as the purposes of section 106 and the regulations are met.

Paragraph (d) provides that if the Agency Official determines in accordance with paragraphs (a) through (c) that there are no historic properties that will be affected, the Agency Official shall provide documentation to the SHPO and is not required to take further steps in the section 106 process. Here, as discussed, the Agency Official did not reach such a determination in accordance with paragraphs (a) through (c). Further, the Agency Official, in this instance, did not provide any required documentation to the SHPO. The procedures of the BIA in this instance essentially substitute for a determination through consultation with the SHPO, a unilateral determination by the Area Archaeologist, based on his own survey, or in the case of Range Unit 562, one by a non-archaeologist, that a realignment of a project is sufficient to avoid any effect on potential historic properties. Although the SHPO testified that the actions taken here may constitute proper avoidance of a historic property, the SHPO testified to an understanding of the regulations that the SHPO must be consulted for all undertakings.

The Court finds that the procedures of the BIA Phoenix office in this instance are contrary to the letter and spirit of the regulations, which rely on consultation, particularly with the SHPO, as the principal means of protecting historical resources. See § 800.1(b). Accordingly, I find that there is a substantial probability of success on the merits as to the alleged violation of section 106 of the Act and the applicable regulations with regard to the failure to consult with the SHPO.

■ Plaintiffs also contend that the defendants are required to consult with plaintiffs or the Navajo Tribe, including cultural leaders, in the section 106 process.

Section 800.1(c) of the regulations identifies the intended participants in the section 106 process. The participants are divided into two classes—consulting parties and interested persons. Consulting parties may include the Agency Official, SHPO, and the Advisory Council. § 800.1(c)(1). Interested persons are defined as "those organizations and individuals that are concerned with the effects of an undertaking on historic properties," and may include local governments, Indian tribes and the public. § 800.1(c)(2). Certain portions of the regulations require that interested persons be invited to be consulting parties, while the Agency Official, SHPO and Council may agree to invite others to become consulting parties where it will advance the objectives of section 106.

With respect to Indian tribes, section 800.1(c)(2)(iii) provides:

> The Agency Official, the State Historic Preservation Officer, and the Council should be sensitive to the special concerns of Indian tribes in historic preservation issues, which often extend beyond Indian lands to other historic properties. When an undertaking will affect Indian lands, the Agency Official shall invite the governing body of the responsible tribe to be a consulting party and to concur in any agreement.... When an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands, the consulting parties shall afford such tribe the opportunity to participate as interested persons. Traditional cultural leaders and other Native Americans are considered to be interested persons with respect to undertakings that may affect historic properties of significance to such persons.

The regulations clearly require that an Indian Tribe participate as a consulting party and that it must concur in any agreement regarding undertakings which affect its lands. The undertakings involved in this action are located on the Hopi Reservation, and the Hopi Tribe must concur in any agreement. As to these projects, the Hopi Tribe approved the range management program, and is actually completing the work on these projects. These projects do not affect Navajo lands, and the regulations do not require participation by the Navajo Tribe as a consulting party, or that it concur in any agreement. However, the plaintiffs argue that consultation must still take place with the Navajo tribe and cultural leaders because these projects affect properties of interest to Indians on non-Indian lands.

While the lands in question are in fact "Indian lands", being part of the Hopi Reservation, they are not Navajo lands and the Navajo Tribe is not the "responsible" tribe and is not required to concur in any agreement. Nevertheless, the regulations clearly contemplate participation by Indian tribes regarding properties beyond their own reservations. The conclusion of the defendants that the Navajo tribe is to be afforded no participation since the lands in question are Hopi lands and not "non-Indian lands" is contrary to the language and evident intent of the regulations, and the facts concerning the history of these two tribes in relation to these lands.

The regulatory scheme depends on consultation with appropriate persons to gather information concerning historic properties to facilitate the identification and adequate consideration of historic preservation in the face of new undertakings. Navajos still reside in the areas affected by these projects awaiting relocation. Under these circumstances, it is clear that input from the Navajo tribe would advance the objectives of section 106. Accordingly, I find that the regulations require that the Nava-

jo tribe be afforded the opportunity to participate as interested persons. This conclusion does not extend to consultation with the plaintiffs, as interested persons or otherwise, or other individual members of the Navajo Tribe.

This conclusion does not infringe on the right of the Hopi Tribe to develop or use its lands, as the Navajo Tribe is not entitled to be a consulting party or to concur in any agreement. It merely assures, as the regulations contemplate, that decisions regarding historic properties will be made upon reasonably adequate information. Further, since each tribe has sites of historic significance that are now located on the reservation of the other tribe, it is in their mutual interests that they reciprocate in the consideration of the historic preservation interests of the other tribe on their respective reservations.

Based on these regulations, I find that the defendants did not adequately take into account the effect of the undertakings on historic properties and that the plaintiffs have made the necessary showing and the motion for a preliminary injunction as to violations of section 106 of the NHPA will be granted.

### 2. Section 110

Plaintiffs also contend that defendants have failed to establish a program to inventory historical sites on the HPL, in violation of section 110 of the Act, 16 U.S.C. § 470h–2. The relevant portion of section 110, 16 U.S.C. § 470h–2(a)(2), provides that with the advice of the Secretary and SHPO, each federal agency shall establish a program to locate, inventory, and nominate to the Secretary all properties under the agency's ownership or control, that appear to qualify for inclusion in the National Register. Defendants contend that they have no section 110 obligations as to Indian lands because the lands are not owned or controlled by the government within the meaning of section 110.

The United States holds legal title to the HPL in trust for the Hopi Indian Tribe, as with other Indian lands. However, while the government holds legal title, it cannot treat the land as its own or use it for government purposes without just compensation. *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *Chippewa Indians of Minnesota v. United States,* 301 U.S. 358, 57 S.Ct. 826, 81 L.Ed. 1156 (1937). Congress retains authority to control and manage Indian lands and affairs as appropriate to protect and advance the tribe, subject to limitations. *Sioux Nation,* 448 U.S., at 415, 100 S.Ct. at 2740–41. Thus, real ownership of the land is in the Indians.

With regard to archaeological resources and historic preservation, other statutes and regulations recognize that ownership of these resources are in the Tribes on whose reservation these resources are located. As discussed above, under Section 106 of the NHPA, the tribe on whose lands the historic properties are located must concur in the handling of those resources. Under the Archaeological Resources Protection Act, although permits must be obtained from the Secretary, Tribes are not required to obtain permits to remove resources on their own reservations, and a Tribe may issue permits to its members. 16 U.S.C. § 470cc(g). Archaeological resources on Indian lands belong to the Indians. 43 CFR 7.13(b). Thus, it is evident that the government's ownership and control of archaeological and historical resources is limited.

There is nothing in section 110 of the Act which suggests that Congress intended to impose the obligations of that section on federal agencies with regard to Indian lands. Plaintiffs have provided no legal authority establishing that such an obligation exists. Congress provided for federal responsibilities with regard to protection of historic resources on Indian lands in section 106 on a project specific basis. The Secretary has concluded that the BIA does not have more general section 110 responsibilities on Indian lands. Based on the evidence and authority presented in support of a preliminary injunction, this Court does not find to the contrary. Accordingly, the motion for a preliminary injunction as to section 110 will be denied.

### C. Historical and Archaeological Data Preservation Act (HADPA)

■ Since the NHPA as originally enacted only provides preconstruction protection of historical and archaeological sites, in 1974 Congress amended HADPA, 16 U.S.C. § 469 et seq., to provide protection to significant scientific, historical or archaeological data discovered during construction. See National Indian Youth Council v. Andrus, 501 F.Supp. 649, 680 (D.N.M.1980). Plaintiffs allege that such data exists at the instant sites and that defendants must cease activities until the survey and review required by section 469a–2 is completed. Defendants contend that plaintiffs have not, and cannot show that such data exists or will be destroyed, or that the triggering mechanisms in HADPA have otherwise been satisfied to invoke the protection of the Act.

Section 469a–1 requires that any federal agency, whenever it finds, or has been notified in writing by an appropriate historical or archaeological authority, that its activities in connection with any federal construction project or program may cause irreparable loss or destruction of significant data, notify the Secretary of the Interior in writing, and provide if appropriate information concerning the project. Section 469a–2 requires the Secretary, upon such written notification, shall, if he determines that such data is significant and is or may be irrevocably lost or destroyed, conduct or cause to be conducted a survey and other investigation of the areas which may be affected and recover and preserve such data.

Plaintiffs have not established that the BIA or Hopi crews have found, or that the Secretary or BIA has been notified in writing by an appropriate authority of the existence of any significant data requiring the Secretary to conduct a survey or other investigation. The BIA area archeologist responsible for notification to the Secretary under HADPA for these projects, testified at the hearing that the Agency has not found significant data or received the required notice of the existence of such data. (Tr. Vol. 2, p. 367). Although plaintiffs contend that the Secretary is now aware of sites and resources on the HPL and in these specific locations, the claims of plaintiffs do not constitute the finding of significant data or notification from an appropriate archaeological authority.

Accordingly, the plaintiffs' have failed to state a claim for a violation of HADPA and the defendants' motion to dismiss this claim (Count VI) will be granted.

### D. Archaeological Resources Protection Act (ARPA)

■ The Archaeological Resources Protection Act (ARPA), 16 U.S.C. 470aa et seq., sets up a permitting system to regulate excavation and removal of "archaeological resources" from public and Indian lands. Archaeological resources are defined as material remains of past human life or activities that are of archaeological interest.

Plaintiffs allege that defendants activities are violating the Act, but did not present evidence of any violation. The BIA area archaeologist, who is responsible for processing ARPA permits and notifying law enforcement officials of violations, testified at the hearing that there has been no excavation of such resources and that the Act is not applicable to these projects. (Tr. Vol. 2, p. 368–69).

Plaintiffs claim is without merit as ARPA is not applicable to the projects and construction activities in this case, and because the activities are within exemptions in the Act or Regulations. As evidenced by the language of the statute and the exemptions to its applicability, the Act is clearly intended to apply specifically to purposeful excavation and removal of archaeological resources, not excavations which may, or in fact inadvertently do, uncover such resources. Other provisions of law, such as the NHPA and HADPA, under which plaintiffs have asserted claims, address the protection of resources discovered in the present circumstances.

Some of the exemptions contained in the statute and regulations are specifically applicable to the activities in this case. First, there is an exception in 43 CFR 7.5(b)(1) for general earth moving excavations pursuant to other authorization which is clearly ap-

plicable in this instance. Further, 43 CFR 7.5(c) provides that permits under ARPA are not required where officials are carrying out official duties under the federal land manager's direction. In this instance, the Secretary would be required to issue a permit to himself to provide protection against injury to resources which is specifically provided under other statutes. Finally, no permit is required, even for excavations of qualifying archaeological resources, by an Indian Tribe on its land. 16 U.S.C. § 470cc(g)(1). In this case, the Hopi Tribe is conducting the activity on the HPL.

Accordingly, under the circumstances in this case, plaintiffs cannot state a claim for a violation of ARPA and the defendants' motion to dismiss this claim (Count VII) will be granted.

## E. *DOI Guidelines*

■ The Department of the Interior has established Guidelines for the disposition of human remains discovered or disturbed on federal lands. The guidelines provide for consultation with interested groups or individuals at the earliest time after disturbance or when it is apparent that disturbance will occur. (Guidelines pp. 1–2). Plaintiffs allege, based on affidavits of several plaintiffs, that the areas involved in the present activities are saturated with the burial sites of the relatives and ancestors of plaintiffs. Plaintiffs further allege that these families have not been afforded notice or been consulted regarding the disturbance of the remains and their disposition. Thus, plaintiffs contend that the defendants have violated the Guidelines.[6]

Defendants contend that there has been no violation because there has not been any disturbance of remains, that plaintiffs have not alleged or proven that any disturbance of remains has actually occurred, and that it is not yet apparent, despite plaintiffs

allegations, that such disturbances will occur. If such occurs, defendants assert that the Guidelines will be followed, although they also contend that the Guidelines are statements of policy and are not binding.

Assuming, for present purposes that the Guidelines are not merely policy statements and are binding on the defendants, plaintiffs have not established that any disturbance has occurred, or that it is apparent that any disturbance will occur. The mere allegations of the plaintiffs that the general area involved is saturated with the burial sites of ancestors and that it is therefore apparent that disturbances will occur, without identification of specific locations or discrete areas that must be avoided or to which the Guidelines should be applied in order to properly dispose of the remains, is insufficient to invoke the procedures set out in the Guidelines. In the event that the plaintiffs can identify specific sites to be avoided or where disturbances will occur, the defendants have stated that they will apply the Guidelines.

Accordingly, the evidence presented by plaintiffs fails to state a claim as to any violation of the Guidelines.[7]

## F. *National Environmental Policy Act (NEPA)*

■ The plaintiffs allege that defendants have violated NEPA, 42 U.S.C. § 4321 *et seq.*, by failing to prepare an Environmental Impact Statement (EIS) required for "any major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The construction activities involved here are related to, and in furtherance of, the Congressional mandate in 25 U.S.C. § 640d–18 that the Secretary implement such conservation and management methods as are necessary to restore the grazing potential of the area to the maximum ex-

---

**6.** Although both parties have discussed an alleged violation of the Guidelines in their memorandums relating to the preliminary injunction and motion to dismiss, and there was evidence relating to this claim at the hearing, the Court notes that the plaintiffs' Complaint For Declaratory Judgment and Injunctive Relief does not contain a claim based on a violation of the

Guidelines, nor are they mentioned anywhere in the Complaint.

**7.** While the Court finds that plaintiffs have failed to state a claim based on a violation of the Guidelines, the complaint contains no such separate claim to be dismissed.

tent feasible. Section 640d–26, as amended in 1980, (six years after the range restoration project began and near its original required completion date), further provides that no action pursuant to, or in furtherance of, the Settlement Act shall be deemed a "major federal action" for purposes of NEPA. Consequently, the plaintiffs can obtain no relief on this claim. *Navajo Tribe v. Andrus,* 644 F.2d 790 (9th Cir.1981).

Plaintiffs nevertheless argue that the statutory exemption to NEPA was not intended to constitute a perpetual exemption for federal range management actions on the HPL. Plaintiffs contend that the present activities go beyond range conservation or restoration authorized by 25 U.S.C. § 640d–18, because the grazing capacity of the range has already been restored as required by the statute. In support of this contention, plaintiffs presented evidence as to the increase in the current grazing capacity of the area, relative to 1974, when the program began, and to prior time periods. The defendants, however, consider the current activities to be part of the ongoing authorized range conservation program.

Whatever the merits of plaintiffs contentions as to the status of the restoration of the range, it is of no consequence to plaintiffs claim. Issues relating to use and permits to use range land and the Secretary's obligation to restore the range are matters which Congress considered to be tribal interests, and intended to be litigated by the Chairmen of the respective tribal councils. Disputes related to grazing and range restoration have been litigated by the tribal chairman in the past and individuals have been found to have no standing to challenge actions related to grazing. See *Sekaquaptewa v. MacDonald,* 544 F.2d 396 (9th Cir.1976); *Hopi Tribe v. Watt,* 530 F.Supp. 1217 (D.Ariz.1982), *aff'd,* 719 F.2d 314 (9th Cir.1983). Plaintiffs have no standing to litigate issues relating to grazing rights or the Secretary's range restoration duties on the HPL.

Upon review of plaintiffs' additional allegations that the defendants' have violated other sections of NEPA and the minimal record with regard to these claims, the Court concludes that plaintiffs have also failed to state a claim as to any other violations of NEPA.

Accordingly, the construction activities challenged here having been exempted from the EIS requirement, plaintiffs having no standing to challenge the activities related to range conservation under the Settlement Act, plaintiffs have failed to state a claim for a violation of NEPA and the defendants' motion to dismiss this claim (Count VIII) will be granted.

### G. *Administrative Procedure Act (APA)*

■ Plaintiffs allege that the decision to proceed with the complained of activities is unlawful within the meaning of section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. Plaintiffs contend that the agency action should therefore be set aside. Specifically, plaintiffs contend that the actions are (1) arbitrary and capricious, and an abuse of discretion, (2) contrary to constitutional rights, (3) in excess of statutory jurisdiction, authority or limits, and (4) without observance of procedure required by law. 5 U.S.C. § 706(2)(A)–(D).

Defendants assert that plaintiffs have not established jurisdiction for review because they have not instituted or exhausted their administrative remedies.

The BIA has regulations which provide administrative appeal procedures for decisions of BIA officials by persons (Indians) who are adversely affected by those decisions, or allege that they are legally or administratively incorrect. 25 CFR Part 2 (1988). The regulations provide that no decision which at the time of its rendition is subject to appeal to a superior authority in the Department shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. § 704. 25 CFR Part 2.3(b). Accordingly, exhaustion of the appeal procedures is a jurisdictional prerequisite to judicial review. *Faras v. Hodel,* 845 F.2d 202 (9th Cir.1988); *White Mountain Apache Tribe v. Hodel,* 840 F.2d 675 (9th Cir.1988).

The argument and record with respect to this claim are minimal. There is no allegation, and no evidence of record that the

plaintiffs filed any administrative appeal or complaint with respect to the present construction activities. Although plaintiffs allege that they notified the fence crews of their objections, there is no evidence that any officials of the BIA were notified of the complaints prior to the filing of the complaint in District Court. In 1986 plaintiff Mae Wilson Tso and other Navajos, through present counsel, filed an administrative complaint with the BIA containing substantially the same allegations now presented to this Court concerning similar construction activities and interferences.

Plaintiffs have not shown jurisdiction as to any claim under the APA, and the defendants' Motion to Dismiss this claim (Count IX) will be granted.

Accordingly, for the reasons stated herein,

IT IS ORDERED granting the defendants' Motion to Dismiss plaintiffs' claims relating to denial of access or interference with tribal religious shrines (i.e. Star Mountain).

IT IS FURTHER ORDERED granting the defendants' Motion to Dismiss Count I of plaintiffs' complaint, alleging a violation of the free exercise clause of the First Amendment, with respect to sites claimed to have individual or local religious significance.

IT IS FURTHER ORDERED granting defendants' Motion to Dismiss Count II of plaintiffs' complaint, alleging a violation of the American Indian Religious Freedom Act (AIRFA).

IT IS FURTHER ORDERED granting the defendants' Motion to Dismiss Count VI of plaintiffs' complaint alleging a violation of the Historic and Archaeological Data Preservation Act (HADPA).

IT IS FURTHER ORDERED granting the defendants' Motion to Dismiss Count VII of plaintiffs' complaint, alleging a violation of the Archaeological Resources Protection Act (ARPA).

IT IS FURTHER ORDERED granting defendants' Motion to Dismiss Count VIII of plaintiffs' complaint alleging a violation of the National Environmental Policy Act (NEPA).

IT IS FURTHER ORDERED granting the defendants' Motion to Dismiss Count IX of plaintiffs' complaint, alleging a violation of the Administrative Procedure Act (APA).

IT IS FURTHER ORDERED granting plaintiffs' motion for a preliminary injunction as to Count V, for violations of section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f and the regulations promulgated thereunder. Defendants are enjoined from continuing construction of the range management and restoration projects in Range Units 257 and 562 and on the remainder of the Hopi Partitioned Lands without compliance with section 106 and the applicable regulations.

IT IS FURTHER ORDERED that plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss are otherwise denied.