**MORONGO BAND OF MISSION INDIANS, Petitioner,**

v.

**FEDERAL AVIATION ADMINISTRATION; William Withycombe, Regional Administrator, FAA, Respondents.**

No. 98–70033.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 1998.

Decided Nov. 23, 1998.

John R. Shordike, Alexander & Karshmer, Berkeley, California, for petitioner.

Marta Hoilman, Environment and Natural Resources Division, United States Department of Justice, Washington D.C., for respondents.

Perry M. Rosen, Cutler & Stanfield, Washington, D.C., for amicus curiae City of Los Angeles.

Steven R. Orr, Richards, Watson & Gershon, Los Angeles, California, for amici curiae City of Hermosa Beach, City of Redondo Beach, City of Manhattan Beach, City of Rancho Palos Verdes, City of Hawthorne, and City of El Segundo.

Before: BRUNETTI, TASHIMA and GRABER, Circuit Judges.

TASHIMA, Circuit Judge:

The Morongo Band of Mission Indians ("Morongo Band" or "Tribe") petitions for review of a Record of Decision ("ROD") of the Federal Aviation Administration ("FAA"), implementing the Los Angeles International Airport ("LAX") East Arrival Enhancement Project ("AEP"). The Morongo Band raises claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f, section 4(f) of the Transportation Act, 49 U.S.C. § 303(c), and various FAA regulations.

We have jurisdiction over this timely petition for review under 49 U.S.C. § 46110(a), and we deny the petition.

## BACKGROUND

The Morongo Reservation is located on over 32,000 acres in Riverside County, California, approximately 90 miles east of Los Angeles. The Reservation includes canyons and undeveloped areas where tribal members conduct traditional ceremonies, as well as sites that they consider sacred for cultural and spiritual purposes.

In February 1997, the FAA began what is called the NEPA scoping process for the AEP. Pursuant to that process, the FAA sent letters to all federal and state agencies, local governments, and private organizations, including the Morongo Band, that might have an interest in the project. The letter stated that the FAA was beginning an environmental assessment of the proposed AEP, described the proposed action, and invited comments about it.

The description of the project enclosed with the letter noted that the volume of arrivals at LAX had increased and was projected to continue to grow in the future, resulting in the need to revise arrival procedures in order to ensure safety and efficiency. In particular, the system of dealing with arrivals from the east, as opposed to the north and west, was in need of change. The FAA therefore proposed to move one of the three existing arrival routes eight miles south, which, unfortunately for the Morongo Band, would cause the flight path to cross the Reservation, instead of bypassing it to the north.

The Tribe responded to the initial scoping letter with a letter detailing some of its concerns, such as the adverse impact on the Reservation of the increased air traffic (an additional 180 aircraft per day). There followed a series of letters, as well as a meeting between the FAA and an Environmental Officer of the Tribe. On June 12, 1997, the Morongo Band sent a letter proposing an alternate route designed to satisfy the AEP's goals without crossing the Reservation. According to the FAA, the draft Environmental Assessment ("EA") was already being printed for publication on June 18, 1997, so the Tribe's proposal could not be included in the draft. The proposal was, however, included in the final EA.

On July 10, 1997, the FAA held a public information meeting on the AEP at the Morongo Tribal Hall. On July 29, 1997, the FAA met with Thomas McCort, the Tribe's technical consultant.

The final EA was issued on August 29, 1997, with a comment period that ran until October 3. In the EA, the FAA discussed

several alternatives, including the Tribe's proposal, but concluded that the best solution was the route that crossed the Reservation. The Morongo Band wrote a letter to the FAA asking technical questions about its own proposal and requesting another meeting before final approval of the EA. The FAA, however, decided that the Tribe had raised no new issues; therefore, on October 24, 1997, it issued a Finding of No Significant Impact ("FONSI") and, on January 30, 1998, issued its ROD granting final approval of the EA. The FAA declined the Tribe's request to stay the project and implemented it on March 10, 1998.

## STANDARD OF REVIEW

■ Under the Administrative Procedure Act ("APA"), an agency's decision may be set aside if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether an agency's decision is arbitrary or capricious, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations and citation omitted).

■ Agency decisions regarding NEPA are reviewed under the arbitrary and capricious standard of the APA. *Association of Pub. Agency Customers v. Bonneville Power Admin.,* 126 F.3d 1158, 1183 (9th Cir.1997). The court may not substitute its judgment for that of the agency regarding environmental consequences of the agency's actions. *Id.* Rather, the court must simply "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). Decisions regarding NHPA and the Transportation Act are similarly reviewed under the arbitrary

and capricious standard. *Communities, Inc. v. Busey,* 956 F.2d 619, 623–24 (6th Cir.1992).

■ Judicial review of agency decisions is generally limited to review of the administrative record. *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997). The Morongo Band, however, seeks to introduce new evidence, on the basis that

> in NEPA cases, the court may extend its review beyond the administrative record and permit the introduction of new evidence where the plaintiff alleges that an [Environmental Impact Statement] has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under the rug.

*Id.* at 526–27 (alteration in original) (internal quotations and citation omitted). "[T]he court may consider, particularly in highly technical areas, substantive evidence going to the merits of the agency's action where such evidence is necessary as background to determine the sufficiency of the agency's consideration." *Inland Empire Pub. Lands Council v. United States Forest Serv.,* 88 F.3d 754, 760 n. 5 (9th Cir.1996) (internal quotations omitted). Thus, when the plaintiff alleges that the agency failed to take into consideration all relevant factors, the court may need to "look[ ] outside the record to determine what matters the agency should have considered but did not." *Id.*

The Tribe contends that the court must apply the "usual canon of construction that a statute designed to benefit Indians must be liberally construed in favor of the Indian beneficiaries." (Citing *Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 64 F.3d 1250, 1257 (9th Cir.1994), *amended on denial of reh'g,* 99 F.3d 321 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997).) Although *Rumsey* does state that "statutes benefitting Native Americans generally are construed liberally in their favor," *id.,* the statutes at issue in the instant case were not designed to benefit Indians. Moreover, *Rumsey* also states that this canon of liberal construction does not

permit the court to contradict the plain words of a statute. *Id.*

## DISCUSSION

### I. United States Trust Responsibility Toward Indian Tribes

■ The Tribe argues that the United States bears a trust responsibility toward Indian tribes, "which, in essence, consists of acting in the interests of the tribes." *Skokomish Indian Tribe v. FERC,* 121 F.3d 1303, 1308 (9th Cir.1997). It is true that agencies of the federal government owe a fiduciary responsibility to Indian tribes. *Id.; Inter Tribal Council of Arizona, Inc. v. Babbitt,* 51 F.3d 199, 203 (9th Cir.1995); *Covelo Indian Community v. FERC,* 895 F.2d 581, 586 (9th Cir.1990); *Nance v. EPA,* 645 F.2d 701, 710 (9th Cir.1981). The court in *Skokomish,* however, also stated that the FERC must exercise this responsibility in the context of the Federal Power Act; therefore, the agency properly declined to afford the tribe "greater rights than they otherwise have under the FPA and its implementing regulations." 121 F.3d at 1309. Moreover, in *Nance,* we noted that procedures provided by the Clean Air Act and EPA regulations (such as consulting with the tribe before taking action) were sufficient to fulfill the EPA's fiduciary responsibility. 645 F.2d at 711.

In *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), relied on by the Morongo Band, the Supreme Court held that the United States was liable for damages for the breach of its fiduciary duties in the management and operation of Indian lands and resources. Although the Court noted the general trust relationship between the United States and the Indian people, the main reasons for its conclusion were the specific obligations placed on the government by statutes and regulations, and the fact that the government "assume[d] such elaborate control over forests and property belonging to Indians." *Id.* at 225.

■ Thus, although the United States does owe a general trust responsibility to Indian tribes, unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes.

### II. LAX Arrival System

The FAA has established 20 Air Route Traffic Control Centers ("Centers") throughout the United States, which are responsible for the control of aircraft during flight. Centers divide their airspace into sectors, each of which is handled by one controller. Each center delegates control over certain sectors to local terminal radar approach control facilities ("TRACONs"), which control aircraft arriving at and departing from major airports. The center is responsible for the initial sequencing of aircraft, providing adequate separation from other traffic, and then transferring control to the local TRACON.

The LA Center is responsible for airspace in parts of Arizona, Nevada, Utah, and southern California. Under the former system, planes approaching LAX from the east passed through two sectors controlled by LA Center, sectors 19 and 20. The Southern California TRACON routes traffic into and out of all major airports in southern California. It controls two LAX arrival sectors, the northern and southern sectors.

LAX has four parallel runways running east-west, grouped in pairs north and south of the terminal. The outer runways are used for arrivals and the inner ones for departures. Under the former system, aircraft arrived from the east on three routes and were merged into one stream by LA Center. LA Center then gave control of this stream to the TRACON responsible for the southern approach to LAX. The northern approach was controlled by a different TRACON and was used primarily by aircraft arriving from the north and west.

Because more planes arrive from the east and south than from the north and west, the southern approach was much busier than the northern approach. That imbalance resulted in delays in the south, as well as imbalances in the workload between the northern and southern controllers. Under the AEP, the FAA reorganized the sectors and moved

Route 3, the southernmost route, renaming it Route 4. LA Center's former sector 19 was split into new sectors 19 and 20, with new sector 20 encompassing the northern portion and new sector 19 encompassing the southern portion of the former sector 19. Route 4 is eight miles south of Route 3, allowing it to be controlled by new sector 19, landing on the southern runway, while Routes 1 and 2 now are controlled by new sector 20, landing on the northern runway. However, because Route 4 is further south than Route 3 was, it crosses the Reservation, whereas Route 3 was situated north of the Reservation. Splitting the eastern arrivals into two traffic streams equalized the air traffic controllers' workloads and reduced delay along the southern runway.

## III. NEPA Claims

NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") when they propose to undertake "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1535–36 (9th Cir.1997) ("*NEDC* "); *Inland Empire*, 88 F.3d at 757–58. The goals of NEPA are: "(1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decision; and (2) to guarantee that this information will be available to a larger audience." *Id.* at 758. NEPA is satisfied once this information is properly disclosed; thus, NEPA exists to ensure a process, not a result. *NEDC,* 117 F.3d at 1536; *Inland Empire,* 88 F.3d at 758.

The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA. *See* 40 .C.F.R. § 1500.1. Under these regulations, an agency is required to prepare an EA in order to determine whether to prepare an EIS or a FONSI. 40 C.F.R. §§ 1501.4; 1508.9. A FONSI means the agency has determined that an action will "not have a significant effect on the human environment." 40 C.F.R. § 1508.13. If a FONSI is made, the agency need not prepare an EIS. *Id.*

### A. Evaluation of Alternatives

The Tribe contends that the FAA violated NEPA, a Department of Transportation ("DOT") Environmental Justice Order, and Executive Order No. 12898 by failing to evaluate or develop alternative routes. As the FAA points out, both the Environmental Justice Order and Executive Order specifically state that they do not create any right to judicial review for alleged noncompliance. *See* DOT Environmental Justice Order, 62 Fed.Reg. 18377, 18378 (1997) ("The Order is an internal directive to the various components of DOT and does not create any right to judicial review for compliance or noncompliance with its provisions."); Exec. Order No. 12898, 59 Fed.Reg. 7629, § 6–609 (1994) ("This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.").

NEPA's regulations require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. "The 'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Resources Ltd. v. Robertson,* 35 F.3d 1300, 1307 (9th Cir.1993) (quoting *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992)). An agency, however, is "entitled to identify *some* parameters and criteria— related to Plan standards—for generating alternatives to which it would devote serious consideration. Without such criteria, an agency could generate countless alternatives." *Id.* (quoting *Mumma,* 956 F.2d at 1522). The "touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *City of Angoon v. Hodel,* 803 F.2d 1016, 1020 (9th Cir.1986) (internal quotations and citation omitted).

The FAA discussed a number of alternative routes in the EA and the ROD, including two, Alternatives 7a and 7b, that were designed to avoid the Reservation. Alternative 7a proposed moving Route 4 either further north or further south in order to avoid crossing the Reservation. The FAA

stated that the definition of a new airspace sector required the new route to be at least ten nautical miles south of the existing routes. Thus, moving Route 4 any further north would have precluded the definition of a new airspace sector, frustrating one of the main objectives of the AEP. Moving Route 4 further south would have caused the route to conflict with departures from LAX and arrivals to Ontario International Airport. Alternative 7a therefore was rejected as infeasible and as not accomplishing the project's objectives.

Alternative 7b proposed extending Route 4 further west, thus avoiding the Reservation before turning south along the original proposed path for Route 4. This route was called Route 4b. The FAA discussed the absence of suitable navigational aids in the area, as well as the time and distance required to complete the turn, and concluded that this proposal would place Route 4b too close to the existing routes to allow the definition of a new airspace sector. This alternative therefore was also considered infeasible.

The FAA thoroughly discussed alternatives that would have bypassed the Reservation, but found them unsuitable for accomplishing the primary purpose of the project—definition of a new airspace sector. As stated in the ROD, "[t]he ability to designate one sector to control aircraft on Routes 1 and 2 and another to control aircraft on Route 4 is the key to the efficiencies sought through this project." "An agency is required to examine only those alternatives necessary to permit a reasoned choice." *Association of Pub. Agency Customers*, 126 F.3d at 1185. The agency thus fulfilled its obligation under NEPA to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.

 The Tribe contends that the FAA arbitrarily chose the location of the new airspace sector boundary and ignored proposed alternative routes that infringe upon that boundary. In support, they submit a declaration from their expert, Thomas McCort.[1] Although McCort states that there "appear to be" alternative routes that would fulfill the

AEP's purpose without crossing the Reservation, where an issue requires "a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Marsh*, 490 U.S. at 377, 109 S.Ct. 1851; *see also id.* ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential.") (quoting *Baltimore Gas & Elec. Co.*, 462 U.S. at 103, 103 S.Ct. 2246); *id.* at 378, 109 S.Ct. 1851 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Moreover, the Morongo Band has failed to point to a specific feasible alternative that would have bypassed the Reservation while still allowing the creation of a new sector.

Related to this issue, the parties dispute who has the burden of offering feasible alternatives. It is true that the FAA has the responsibility to "study, develop, and describe appropriate alternatives." 42 U.S.C. § 4332(2)(E). The FAA has fulfilled that requirement, however, by developing and discussing a number of alternatives, including Alternatives 7a, 7b and 4b.

Moreover, in *City of Angoon*, we stated that the parties claiming a NEPA violation "had not offered a specific, detailed counterproposal that had a chance of success. Those who challenge an EIS bear a responsibility 'to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.'" 803 F.2d at 1022 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). The Seventh and Eighth Circuits have similarly implied that the burden is on the party challenging the agency action to offer feasible alternatives. *See Olmsted Citizens for a Better Community v. United States*, 793 F.2d 201, 209 (8th Cir.1986) ("Olmsted Citizens to succeed on its claim must make some showing that feasible alternatives exist. Absent such a showing Olmsted Citizens asks this court to presume that an adequate alternate

---

**1.** McCort worked for the FAA in various capacities for a number of years.

site exists somewhere and that the government did not try hard enough to find this site . . . .") (internal citations and footnote omitted); *River Rd. Alliance, Inc. v. Corps of Eng'rs of United States Army,* 764 F.2d 445, 452–53 (7th Cir.1985) ("The Corps was entitled not to conduct a further study of alternatives unless the plaintiffs were prepared to shoulder the burden of showing that National Marine had overlooked some plausible alternative site—and they were not."). The FAA has fulfilled its obligation to consider reasonable alternatives.

### B. Evaluation of Noise Impact

The Tribe makes four claims regarding the FAA's evaluation of the noise impact. It contends that the FAA: (1) mischaracterized existing noise levels on the Reservation; (2) inappropriately used urban noise significance criteria in evaluating the impact of noise on the Reservation; (3) failed to consider single-event noise levels; and (4) should have prepared an EIS, because the noise violates tribal noise standards. In support of their contentions, the Tribe relies on a declaration by Hans Giroux, an "acoustical specialist."

We have generally rejected plaintiffs' attempts to "engage in a battle of experts" regarding issues such as air quality and noise because, "when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Price Rd. Neighborhood Ass'n, Inc. v. United States Dep't of Transp.,* 113 F.3d 1505, 1511 (9th Cir.1997) (quoting *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992)); *see also Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) ("We are in no position to resolve this dispute because we would have to decide that the views of Council's experts have more merit than those of the [government's] experts.") (internal quotations omitted). Nevertheless, we address each of the Tribe's claims *seriatim.*

### 1. Existing Noise Levels

The Tribe complains that the FAA did not monitor actual noise levels on the Reservation and that actual background noise levels were below 30 decibels ("dB") and as low as 20 dB, whereas the lowest background noise level used in the EA was 30 dB CNEL.[2] If the FAA overstated background noise levels, the impact of new noise created by the AEP would be underestimated.

The FAA based its 30 dB CNEL background noise level on measurements by the National Park Service and a private consultant. The National Park Service measured sound on and near the rim of the Grand Canyon, finding noise levels from 34–48 dB at actively visited areas and in the low 20's in more remote areas. Although the Park Service did not use the Ldn or CNEL standards, the FAA stated that a steady sound level of 23 dB for 24 hours would correspond to 30 dB CNEL. The consultant whom the FAA used measured noise in Scottsdale and Tucson, Arizona, as well as a rural area outside Phoenix, and showed background noise levels in sparsely developed desert areas to be below 40 Ldn or CNEL. Based on these two measurements, the FAA concluded that 30 dB CNEL was "a reasonable estimate of a background noise level in completely undeveloped desert and mountain areas."

Although noise levels on the Reservation may not seem comparable to those in the heavily-visited Grand Canyon, the FAA relied on the Park Service's measurement in more remote locations of the Grand Canyon, rather than the actively visited areas. Furthermore, it is not for the court to assess whether a "rural area" outside Phoenix would have background noise levels similar to those on the Reservation. The Morongo Band has failed to establish that the FAA's decision to use the 30 dB CNEL level was arbitrary or capricious.

---

**2.** CNEL stands for "community noise equivalent level," the standard adopted in California for the measurement of noise levels in airport noise studies. The CNEL measurement is similar to the day-night sound level (DNL or Ldn) standard that the FAA uses for airport noise studies in all other states. Ldn measures cumulative noise exposure over a 24–hour period and is generally designed to determine the potential of noise to interfere with human activity.

### 2. Urban Noise Significance Criteria

■ The Tribe contends that the FAA inappropriately used urban noise significance criteria in assessing the noise impacts on the Reservation. The Tribe apparently argues that the FAA claims that average daily noise levels above 45 dB CNEL do not have any impact on land uses and that noise levels below 65 dB CNEL cannot have a significant impact on ordinary activities. However, the portion of the EA that the Tribe cites deals with the effects of changes in the CNEL depending on the existing noise exposure, rather than the effect of an existing CNEL. The EA does state that 65 dB CNEL is the threshold above which aircraft noise is considered to cause a significant adverse impact in residential areas. The EA then goes on to explain, however, that, if existing CNEL noise exposure is 45–60 dB, an increase of 5 dB would have a marginal impact, whereas if existing CNEL is greater than 65 dB, an increase of only 1.5 dB would have a significant impact. Moreover, in the EA's discussion of the noise impacts of its various alternatives, its focus was on the effect of the increase, not on the actual existing noise level: "Even in undeveloped areas with very low background noise levels, increases in total ambient noise with Alternatives 5A and 5B are far too small to be considered either significant or marginal impacts."

The Morongo Band analogizes to *National Parks and Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir.1993), in which the Tenth Circuit concluded that the FAA's determination of no significant impact on a recreational area was irrational, because the agency provided no empirical evidence to support the claim, basing its determination only on a subjective evaluation of the impact of noise on recreational users of a national park. Unlike *National Parks and Conservation Ass'n*, however, where the FAA argued that its analysis needed to be "subjective and inexact" because there was "no acceptable methodology to measure noise impacts," *id.*, the FAA in the instant case performed a detailed analysis using figures obtained from the LAX Master Plan and the Southern California TRACON to estimate the numbers of aircraft and relied on its standard methodolo-

gy for airport noise studies. This case therefore is distinguishable from *National Parks and Conservation Ass'n*, because the FAA's methodology and reasoning cannot be described as irrational or subjective. *See id.* ("The FAA explicitly rejected the Ldn methodology and performed the noise impact analysis based on various assumptions and subjective values which did not provide us with a 'rational' decision that we could assess.").

Finally, in response to another petitioner's challenge to the FAA's use of 65 Ldn as the threshold of significance for noise impacts, we stated that "NEPA authorizes federal agencies to develop their own methods and procedures in regard to environmental analysis." *Seattle Community Council Fed'n v. FAA*, 961 F.2d 829, 833 (9th Cir.1992). The Tribe has failed to establish that the FAA's methodology was arbitrary or capricious.

### 3. Single–Event Noise Impact

■ The Tribe further contends that the FAA was required to consider single-event noise levels rather than average daily noise levels because of the sensitive cultural and religious uses of the land. However,

Neither the CEQ regulations nor the FAA's own regulations require single-event testing in addition to or in lieu of cumulative testing. In fact, the FAA's regulations appear to require the use of cumulative data. "The exposure of individuals to noise resulting from the operation of an airport *must* be established in terms of yearly day-night average sound level...." 14 C.F.R. § 150.9(b) (1991) (emphasis added).

*Id.; cf. Busey*, 956 F.2d at 624 (upholding the FAA's use of cumulative noise impact methodology as opposed to individual-event noise analysis as an exercise of the agency's discretion).

The Morongo Band points to *National Parks and Conservation Ass'n* as evidence that the FAA is aware of the limitation of average noise criteria and so has used single-event noise levels to measure noise impacts on undeveloped areas. However, as discussed above, the Tenth Circuit reversed the FAA's decision in that case, concluding that

the FAA's rejection of the Ldn methodology and subjective evaluation of noise impacts was irrational. 998 F.2d at 1533. The Tribe has pointed to no authority that would require us to conclude that the FAA's decision to rely on average noise levels, rather than single-event noise impacts, was arbitrary or capricious.

### 4. Tribal Noise Standards

 Finally, the Tribe argues that the FAA violated its own regulations, which require preparation of an EIS if the project "is determined not to be reasonably consistent with plans or goals that have been adopted by the community in which the project is located." (Quoting DOT, FAA Order 1050.1D, "Policies and Procedures for Considering Environmental Impacts," Dec. 5, 1986 ("FAA Order 1050.1D").) Although, understandably, the Tribe may be unhappy with any increase in noise that interferes with its traditional practices, it fails to put forth any evidence of "plans or goals ... adopted by the community" with which the AEP is inconsistent. Unfortunately for the Morongo Band, it appears that its quarrel is with the result reached by the EA. As we have stated, however:

> NEPA does not mandate particular substantive results, but instead imposes only procedural requirements. Thus, in considering a challenge under NEPA, [we] may not substitute [our] judgment for that of the agency concerning the wisdom or prudence of a proposed action. Under our "rule of reason," we determine whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences by making a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation.

*Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir. 1994) (alterations in original) (citations and internal quotations omitted).

### C. Segmenting, Growth–Inducing and Cumulative Impacts

The Tribe contends that the FAA improperly segmented the AEP from a larger project, the LAX Expansion Project, for which the FAA is preparing an EIS. The Tribe claims that: (1) the two projects are "connected" and thus should be considered in the same EIS; (2) the FAA should have considered the growth-inducing impact of the AEP on the Expansion Project; and (3) the FAA failed to consider the cumulative impact of the two projects.

### 1. Connected Actions

 CEQ regulations require "connected actions," meaning those that are closely related, to be discussed in the same EIS. 40 C.F.R. § 1508.25(a)(1). Although federal agencies are given "considerable discretion" in defining the scope of an EIS, connected actions must be considered together in order to preclude an agency from "divid[ing] a project into several smaller actions, each of which might have an insignificant environmental impact when considered in isolation, but which taken as a whole have a substantial impact." *Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir.1995) ("*NRIC*"). Actions are connected if they: "(i) Automatically trigger other actions which may require environmental impact statements. (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously. (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1).

In *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985), we concluded that the construction of a road in a forest and the sale of timber were connected actions within the meaning of the CEQ regulations. Because the timber sales could not proceed without the road, and the road would not have been built but for the timber sales, the two were "inextricably intertwined." *Id.* at 759. The analysis of *Thomas* was closely followed in *Save the Yaak Comm. v. Block*, 840 F.2d 714, 720 (9th Cir.1988), in which we similarly found a "clear nexus" between timber sales and the improvement of a road. In *Save the Yaak Comm.*, there was "no indication that the road was reconstructed for any ... reason" other than the timber sales. *Id.*

By contrast, we rejected a claim that actions were "connected" when each of two projects would have taken place with or without the other and thus had "independent utility." *NRIC,* 56 F.3d at 1068. In *NRIC,* both an ongoing salmon transportation program and proposed river flow improvement measures "could exist without the other, although each would benefit from the other's presence." *Id.* at 1069 (quoting *Sylvester v. United States Army Corps of Eng'rs,* 884 F.2d 394, 400 (9th Cir.1989)).

 Unlike *Thomas* and *Save the Yaak Comm.,* but like *NRIC,* the AEP and the LAX Expansion Project have independent utility. There is no indication in the EA or ROD that the AEP would not have been implemented apart from the Expansion Project. On the contrary, the primary purpose of the AEP was to deal with *existing* problems of delay and inefficiency in the arrival system.

In describing the need for the AEP, the FAA did discuss the increase in LAX air traffic since 1980 and the projected increase in the future. The FAA stated that "the current problems will only become more serious as traffic at LAX increases." However, the stated purpose of the project was "to improve the efficient use of airspace, reduce air traffic delays, balance controller workload, and improve coordination among controllers." Thus, although the FAA was concerned about the pressure that increased traffic would place on the system, the purpose of the AEP was to deal with existing problems caused by the inefficient "use of airspace for arrivals to LAX from the east." The ROD similarly focused on the delay and inefficiency caused by the former system and stated that the AEP would "improve the safety of air traffic operations by reducing congestion in the airspace and air traffic controller workloads." Thus, although growth at LAX would exacerbate the problems being addressed by the project, the AEP was necessarily independent of any future expansion of the airport.

## 2. Growth–Inducing Impact

 The Morongo Band contends that the FAA improperly failed to consider the "growth-inducing" impact of the AEP, as required by 40 C.F.R. § 1508.8(b) (defining "indirect effects" as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," including "growth inducing" effects). The Tribe's argument centers on the point that the AEP removes a constraint to growth at LAX because, without the project, growth could not occur safely.

The EA does not discuss the growth-inducing impact of the AEP. This fact, however, is not dispositive. In *Seattle Community Council Fed'n,* the FAA did not consider cumulative effects caused by the expected increase in air traffic after changes in flight patterns were implemented. In considering whether that failure required remand for the FAA to consider the issue, we focused on the stated purpose of the plan and concluded that, although the increased efficiency and reduction in delays would "necessarily allow the volume to increase," the plan was intended to and did deal with the existing air traffic. 961 F.2d at 835. The increased air traffic caused by the plan therefore was not considered to be a growth-inducing effect under 40 C.F.R. § 1508.8(b). *Id.*

Similarly, in *City of Carmel–by–the–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1162 (9th Cir.1997), we acknowledged that a planned freeway "may induce limited additional development," but reasoned that it was "the existing development that necessitate[d] the freeway." By contrast, in *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975), the area was not already well developed and so the construction of a freeway interchange would necessarily lead to development.

Growth certainly may be a foreseeable indirect effect of the AEP. However, the project was implemented in order to deal with existing problems; the fact that it might also facilitate further growth is insufficient to constitute a growth-inducing impact under 40 C.F.R. § 1508.8(b).

## 3. Cumulative Impact

The Tribe argues that the FAA failed to consider the cumulative impact of the AEP

with the Expansion Project. An agency is required to consider cumulative impacts in an EIS, meaning actions that "when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2); *see Association of Pub. Agency Customers,* 126 F.3d at 1184; *City of Carmel-by-the-Sea,* 123 F.3d at 1160. A cumulative impact is defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

■■ In its discussion of cumulative actions, the FAA noted that one action that could have a cumulative impact was an "increase in the number of flights to LAX using the proposed new alternative flight routes." The agency concluded, however, that this increase would not have a significant impact, noting that the noise consequences were considered in Section 4.1.

Other actions potentially having a cumulative impact were increases in traffic at other airports in the area affected by the AEP. Regarding this concern, the FAA stated that "the noise analysis has demonstrated conclusively that the increases in noise attributable to the proposed project are extremely small" and further pointed out that other airport projects would deal with noise impacts in their own EAs or EISs. Finally, the FAA noted that the AEP would have no significant impact on air quality and explained why other increases in high altitude air traffic in the area affected by the AEP would not affect air quality in the Los Angeles coastal basin.

Assuming that the cumulative impacts of the Expansion Project should have been considered in the EA, because it appears to be a project that is both foreseeable and similar to

the AEP, as both projects deal with increasing arrivals at LAX,[3] *see Resources Ltd.,* 35 F.3d at 1306 ("Where several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS.") (internal quotations and citation omitted), this requirement was met. The FAA relied on projections from the LAX Master Plan study and the Southern California TRACON in order to derive data for its noise analysis. Thus, when the agency made projections about aircraft arrivals in the years 2000 and 2015 throughout its noise analysis, it necessarily considered the cumulative impact of increased traffic due to the Expansion Project. The projected increases in arrival traffic at LAX, and the resulting impacts on noise levels, were fully integrated into the FAA's noise analysis, thus fulfilling the agency's requirement to consider cumulative impacts.

## IV. NHPA Claims

NHPA requires a federal agency to "take into account the effect of [any] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. The agency also must give the Advisory Council on Historic Preservation a "reasonable opportunity to comment with regard to such undertaking." *Id.* In consultation with the State Historic Preservation Officer ("SHPO"), the official responsible for representing the interests of the State and its citizens, 36 C.F.R. § 800.1(c)(1)(ii), the agency "shall make a reasonable and good faith effort to identify historic properties that may be affected by the undertaking and gather sufficient information to evaluate the eligibility of these properties for the National Register." 36 C.F.R. § 800.4(b). An agency has satisfied the NHPA process if it shows that the project will have no adverse effect on historic resources, submits documentation of this finding to the SHPO for review, and the SHPO does not object within 15 days. 36 C.F.R. § 800.5(b).

---

**3.** Bill Johnstone of the FAA stated in his declaration that the City of Los Angeles is "midway" through the "airport redevelopment planning process," *i.e.,* the LAX Master Plan (which we assume is the "LAX Expansion Project" to which the Tribe refers), and that the draft EIS is to be published in September, 1998.

The Tribe contends that the FAA violated NHPA by failing to prepare an EIS as required by NHPA and FAA Order 1050.1D and by failing to obtain the Tribe's consent for the AEP.

## A. Preparation of EIS

The Morongo Band cites FAA Order 1050.1D, ¶ 37.a(1), which states that an EIS shall be prepared if an FAA action has an effect that is "not minimal" on properties protected by NHPA. In the EA, the FAA stated that the only change caused by the AEP would be increased "high altitude aircraft overflights." According to the EA, the altitude of LAX traffic overflying the Reservation would be 18,000 feet above sea level, or 16,000 feet above ground level. Thus, the FAA's noise, land use, and visual impact studies all concluded that the project would cause no adverse impacts, leading to the conclusion that historic resources would be "unaffected" by any of the alternatives. *Id.* Because the effect would be minimal, an EIS was not required pursuant to FAA Order 1050.1D.

The Morongo Band relies on *Pueblo of Sandia v. United States,* 50 F.3d 856 (10th Cir.1995), in which the Tenth Circuit held that the agency did not make a reasonable effort to identify property eligible for the National Register because it failed to follow up on information indicating the existence of such property. *Id.* at 860 ("a mere request for information is not necessarily sufficient to constitute the 'reasonable effort' [NHPA] requires"). The court also held that the Forest Service failed to make a good faith effort to identify cultural property in the canyon, because the agency told the SHPO that there was no evidence of such property when, in fact, the agency had withheld from the SHPO two affidavits alluding to sacred sites and traditional ceremonies in the canyon. *Id.* at 862.

 Like the Forest Service in *Pueblo of Sandia,* the FAA made only a "request for information" and did not follow up on a letter from the Tribe, although the letter indicated

the possibility of historic or cultural property in the area. This case, however, is distinguishable from *Pueblo of Sandia.* Here, the FAA's conclusion was not based on a finding of no cultural properties in the area, but on the fact that the noise and other studies showed that there would be no impact on any type of property in the project area. Thus, the failure to identify specific potential sites or properties is irrelevant. The FAA informed the California SHPO of its finding that the AEP would have "no effect on cultural values," submitting as documentation the draft EA.[4] The SHPO had no objection to the FAA's determination of no effect on historic properties because of "the unique high altitude nature of the undertaking." The Morongo Band has failed to establish that the agency's studies were arbitrary or capricious; thus, the FAA did not violate NHPA.

## B. Failure to Obtain Consent

 The Tribe argues that NHPA required the FAA to obtain the Tribe's consent before implementing the AEP. The regulations state:

> The Agency Official, the [SHPO], and the Council should be sensitive to the special concerns of Indian tribes in historic preservation issues, which often extend beyond Indian lands to other historic properties. When an undertaking will affect Indian lands, the Agency Official shall invite the governing body of the responsible tribe to be a consulting party and to concur in any agreement.

36 C.F.R. § 800.1(c)(2)(iii).

Consent is required, however, only if the action is found to have an effect on the land and, here, a finding of no effect was made. The Tribe cites *Attakai v. United States,* 746 F.Supp. 1395, 1408 (D.Ariz.1990), which discusses the importance of an Indian tribe's concurring "in any agreement regarding undertakings which affect its lands." The projects in *Attakai,* however, involved the construction of three fence lines, a pipeline and a tank on the land. *Id.* at 1399. There is no

---

4. The portions of the draft EA dealing with the AEP's impact on historic property are essentially identical to those in the final EA.

question that the projects affected the Indian lands in *Attakai,* whereas the effect in the instant case is much more remote. Where, as here, any effect is insignificant or minimal, the FAA was not required to obtain the Tribe's consent before implementing the AEP.

### V. Transportation Act Claim

Finally, the Tribe claims that the FAA violated section 4(f) of the Transportation Act, 49 U.S.C. § 303(c), which provides that a transportation project may "use" historic sites only if (1) there is no prudent and feasible alternative, and (2) the project includes all possible planning to minimize harm to the site resulting from the use. "The term 'use' is to be construed broadly, not limited to the concept of a physical taking, but includes areas that are significantly, adversely affected by the project." *Adler v. Lewis,* 675 F.2d 1085, 1092 (9th Cir.1982). The section's provisions, however, do not apply unless there is a determination that the land is to be "used." *Id.*

The EA quotes an FAA Order that provides that an action is compatible with the normal activity associated with land and, therefore, does not constitute "use" under section 4(f) if the action "would not affect the normal activity or aesthetic value of" the land. (Quoting FAA Order 5050.4A, Airport Environmental Handbook.) The FAA acknowledged that aircraft noise levels that "substantially interfere" with the use or value of section 4(f) property would constitute constructive use. The noise analysis in Section 4.1 concluded, however, that the resulting noise would not be "loud enough to create significant impacts anywhere along either of the proposed alternative routes (Routes 4 and 4a)." The FAA also discussed potential visual impacts and concluded that the project would not cause significant visual impacts.

"[S]ection 4(f) will not be invoked where the activity complained of will have only an insignificant effect on the existing use of the parkland." *Allison,* 908 F.2d at 1030. The FAA undertook a thorough analysis in the EA and concluded that the AEP would have only an insignificant impact on the existing

use of the land. We do not find that this decision was arbitrary or capricious.

### CONCLUSION

The FAA's decision to implement the AEP was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The FAA did not violate NEPA, NHPA, or the Transportation Act. Accordingly, the Morongo Band's petition for review is

**DENIED.**