**REDMOND–ISSAQUAH RAILROAD PRESERVATION ASSOCIATION,**
Petitioner,

v.

**The SURFACE TRANSPORTATION BOARD; United States of America, Respondents.**

and

The Land and Conservancy of Seattle and King County; and Burlington Northern and Santa Fe Railway Company, Intervenors.

No. 98–70906

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 2000

Filed Sept. 14, 2000

Thomas F. McFarland, Jr., McFarland & Herman, Chicago, IL, for appellant.

Robert B. Nicholson and John P. Fonte, Department of Justice, Washington D.C. and Evelyn G. Kitay, Surface Transportation Board, Washington, D.C., for the appellees.

Sarah Whitley Bailiff, The Burlington Northern and Santa Fe Railway Company, Forth Worth, TX and Betty Jo Christian, Carolyn Doozan Clayton, and Carol R. Goisan, Steptoe & Johnson LLP, Washington, D.C., for the intervening respondent The Burlington Northern and Santa Fe Railway Company.

David J. Eldred, Deputy Prosecuting Attorney, King County, Seattle, WA and Charles H. Montange, The Land Conservancy of Seattle and King County, Seattle, Washington, for the intervening respondents, King County, Washington and The Land Conservancy of Seattle and King County.

Before: PREGERSON and D.W. NELSON, Circuit Judges, and KARLTON, District Judge.*

* The Honorable Lawrence K. Karlton, United States District Judge for the Eastern District of California, sitting by designation.

D.W. NELSON, Circuit Judge:

The Redmond–Issaquah Railroad Preservation Association ("RIRPA"), an organization made up largely of homeowners living along Lake Sammamish in King County, Washington, appeals the Surface Transportation Board's ("STB") decision rejecting its Offer of Financial Assistance ("OFA") to acquire the Redmond–Issaquah railroad line; the line, measuring 12.45 miles, runs between Redmond and Issaquah along Lake Sammamish. The STB, determining that future traffic on the line was extremely speculative, concluded that RIRPA was not interested in continuing rail services. RIRPA appeals the STB's denial of its OFA, contending that the agency exceeded its statutory authority because the OFA approval procedure does not warrant using the continuation of rail services as an eliminating criterion. RIRPA also asserts that the STB's decision was arbitrary and capricious. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The disposition of the Redmond–Issaquah line has been a highly contentious matter, with recreational trail advocates on one side and property owners on the other viewing it as a zero-sum issue. This appeal is only the most recent manifestation of the struggle which began when The Burlington Northern and Santa Fe Railway Company ("BNSF"), in April 1997, concluded that continued operation of the line was not economically viable; BNSF had suspended rail services the previous year for safety reasons. The company subsequently negotiated an agreement whereby it would transfer to The Land Conservancy the assets, rights, and obligations related to the Redmond–Issaquah line. The Land Conservancy, in return, agreed to pay BNSF $1.5 million and to assume or arrange for the assumption of all common carrier obligations pertaining

to the line. As Congress, through the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"),[1] has inhered in the STB the authority to review all acquisitions of rail lines, The Land Conservancy petitioned the STB for a non-carrier class exemption to acquire and operate the line without being subject to the usual certification procedure. *See* 49 U.S.C. § 10901 (1996). The STB granted the acquisition exemption and, on April 22, 1997, BNSF and The Land Conservancy consummated the part sale and part charitable donation transaction.

Less than two months later, on June 11, 1997, The Land Conservancy petitioned the STB for authority to abandon the line in order to discontinue it for future rail service and remove it from the national transportation system.[2] As with acquisitions, owners may not abandon railroad lines without the STB's approval. *See* 49 U.S.C. § 10904 (1996). In granting the STB and its predecessor entity, the ICC, the authority to regulate abandonments, Congress sought to balance the railroad companies' need to manage its tracks in an economically efficient manner with the public's need for a functioning interstate railroad system. *See Colorado v. United States,* 271 U.S. 153, 168–69, 46 S.Ct. 452, 70 L.Ed. 878 (1926). At the same time The Land Conservancy sought abandonment, it petitioned the STB to use the Redmond–Issaquah line as a recreational trail. Under the National Trails System Act of 1983, more commonly known as the "Rails to Trails Program," the STB may approve the interim use of railroad corridors otherwise ripe for abandonment as recreational trails. *See* 16 U.S.C. § 1247(d) (1985). The use is deemed interim because the corridor is railbanked, or maintained, for possible future rail use.

The STB took issue with The Land Conservancy's plan to railbank the line and, in September 1997, revoked the acquisition exemption and ordered the organization to reconvey the Redmond–Issaquah line to BNSF:

> The policy underlying the governing acquisition exemption procedures is to support the continued operation of rail lines in lieu of abandoning them. There is no set period of time during which a line must be operated before abandonment authority can be sought. However, when an acquiring noncarrier initiates abandonment proceedings within days after consummating the acquisition of the line, and there are no extenuating circumstances, our processes are being abused. The facts here support the conclusion that TLC never had any intention of reinstituting rail service on the line. It appears, rather, that TLC has put into effect a plan to convert the line to trail use as soon as possible following its acquisition of the line. This constitutes a misuse of our procedures, which envision that a party that acquires an active rail line does so to continue to provide rail service. Manifestly, TLC never had any such intent.

*The Land Conservancy of Seattle and King County—Acquisition and Operation Exemption—The Burlington Northern and Santa Fe Ry. Co.,* STB Finance Docket No. 33389 at 3 (served Sept. 26, 1997). The STB, in a later decision consolidating the acquisition exemption and abandonment exemption proceedings, denied the petition to reconsider its decision revoking the acquisition and dismissed The Land Conservancy's petition to abandon the line. *See The Land Conservancy of Seattle and King County—Acquisition and Operation*

---

1. The ICCTA abolished the Interstate Commerce Commission ("ICC") and transferred certain functions and proceedings, including the ones at issue here, to the STB. *See* Pub.L. No. 104–88, 109 Stat. 803 (1995).

2. The STB may authorize line abandonments in two ways: (1) affirmatively approve the abandonment if it determines "that the present or future public convenience and necessity require or permit" it, *see* 49 U.S.C. § 10903(d)(2) (1996); or (2) grant an exemption from the certification process, *see* 49 U.S.C. § 10502(a) (1996).

*Exemption—The Burlington Northern and Santa Fe Ry. Co.,* STB Finance Docket No. 33389; *The Land Conservancy of Seattle and King County—Abandonment Exemption—in King County, WA,* STB Docket No. AB–508X; *The Burlington Northern and Santa Fe Ry. Co.—Abandonment Exemption—in King County, WA,* STB Docket No. AB–6 (Sub–No. 380X) (served May 13, 1998) (hereinafter referred to collectively as *"Acquisition and Abandonment Exemptions "*). In addition, the STB reinstated the abandonment exemption proceeding initiated by The Land Conservancy, substituted BNSF as the petitioner, and granted it an exemption to abandon the line. *See id.* at 11. In so doing, the STB advised that if BNSF exercised the abandonment exemption, "any person desiring rail service to be continued" would have the opportunity to file an OFA under 49 U.S.C. § 10904 (1996). *Id.* at 13. An OFA, also referred to as a "forced sale," is the procedure by which a party may prevent a line's abandonment or discontinuance by purchasing it or subsidizing the carrier's service. The STB warned, however, that it would carefully review any OFA filed given the circumstances under which it revoked The Land Conservancy's acquisition of the line:

> Specifically, because the information now before us shows that this line is not currently being used for rail service and that there is no apparent demand for rail service, any entity filing an OFA should be prepared to submit not only evidence of its financial responsibility, but also evidence of a public need for continued rail service.... We will not tolerate abuse of the OFA procedures by either proponents or opponents of an OFA.

*Id.* at 14. RIRPA filed its OFA in June 1998 and immediately met with resistance. BNSF argued that RIRPA did not intend to continue rail service and The Land Conservancy, along with King County, charged that the association's primary aim was to frustrate the development of a nature trail in order to protect the privacy of its members' properties. Of significance here, the railroad corridor at issue is the largest missing link in a statewide trail extending from Puget Sound to northern Idaho.

The STB, taking into consideration opposition to RIRPA's OFA as well as evidence that future traffic was highly speculative, rejected the OFA:

> Here, after considering all the evidence presented by RIRPA and the other parties, we conclude that the record does not permit us to conclude that the offer is motivated by a desire to provide continued rail service. Nor can we find that continued rail service is likely to result from the offer. That being the case, it would be an abuse of our processes to permit the section 10904 process to go forward.... That their primary motivation might be to defeat interim trail use would by itself not condemn an offer, as long as they were intending to provide rail service and there existed a real need for that service.... However, RIRPA's statements provide no basis for us to conclude that future traffic on the line is other than highly speculative.

*The Burlington Northern and Santa Fe Ry. Co.—Abandonment Exemption—in King County, WA In the Matter of an Offer of Fin. Assistance,* STB Docket No. AB–6 (Sub–No. 380X) at 7–8 (served Aug. 5, 1998) (hereinafter referred to as *"Offer of Fin. Assistance "*). By letter filed with the STB on August 10, 1998, BNSF indicated that it would act on the abandonment exemption and agreed to the imposition of a trail condition. The STB, by decision dated September 18, 1998, imposed a trail condition providing 180 days for the parties to reach an agreement under the Trails Act. The parties have since negotiated an interim trail use arrangement.

## II. STATUTORY INTERPRETATION

RIRPA contends that the STB erred in denying its OFA because Congress, in enacting the ICCTA, eliminated the continuation of rail service as a criterion in the

OFA approval process. The former OFA provision stated explicitly that the ICC, in reviewing offers, must find that the offeror is financially responsible and "has offered financial assistance to enable the rail transportation to be continued over that part of the railroad line to be abandoned or over which all rail transportation is to be discontinued." 49 U.S.C. § 10905(d)(1). Congress, in the ICCTA, omitted the phrase "enable the rail transportation to be continued" and required that OFA approval be based on a finding that "one or more financially responsible persons (including a governmental authority) have offered financial assistance regarding that part of the railroad line to be abandoned or over which all rail transportation is to be discontinued...." 49 U.S.C. § 10904(d)(1). Despite this change, the STB construes the aim of § 10904 to be the continuation of rail service: "In implementing section 10904 of the ICC Termination Act, formerly section 10905 of the Interstate Commerce Act, we must be mindful that Congress enacted the OFA provisions to provide for continued rail service." *Offer of Fin. Assistance* at 5.

■ Congress has not directly addressed the question at issue here. Our review of the STB's construction of § 10904 is therefore limited as "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As a function of this deference, we are prohibited from substituting our "own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.; see Tovar v. United States Postal Serv.*, 3 F.3d 1271, 1276 (9th Cir.1993).

■ In considering the STB's reading of § 10904, we begin with the language of the statute and examine not only the specific provision at issue but also the structure of the statute: "We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *See Pension Benefit Guar. v. Carter & Tillery Enter.*, 133 F.3d 1183, 1186 (9th Cir.1998) (quoting *In re Rufener Constr., Inc.*, 53 F.3d 1064, 1067 (9th Cir.1995)). Statutory interpretation is a referential endeavor. *See Smith v. United States*, 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("Language, of course, cannot be interpreted apart from context.").

■ Reading § 10904 as a whole, we do not find it to be unreasonable for the STB to conclude that Congress retained the original aim of the OFA procedure in enacting the ICCTA. Beginning with the provision's title, "Offers of Financial Assistance to Avoid Abandonment and Discontinuance," Congress signals its interest in the continued operation of railroad lines where possible. This signal gains resonance in the various parts of § 10904. In subsection (b), Congress requires all rail carriers who have filed an application for abandonment or discontinuance to provide to the STB and to parties considering offers of financial assistance "an estimate of the annual subsidy and minimum purchase price *required to keep the line or a portion of the line in operation.*" § 10904(b)(1) (emphasis added). Such rail carriers must also provide "traffic, revenue, and other data necessary to determine the amount of annual financial assistance which would be *required to continue rail transportation over that part of the railroad line.*" § 10904(b)(2) (emphasis added). In our view, Congress would require that such information be submitted during the OFA approval process only if its intent was to sustain operation of the railroad line to be abandoned or discontinued.

Other provisions of § 10904 undermine RIRPA's assertion that the STB lacks the statutory authority to reject its OFA on the ground that it would not provide for the continuation of rail services. Where the rail carrier and an offeror fail to agree on the purchase amount, for instance, the STB is charged with establishing the con-

ditions and amount of compensation. In so requiring, Congress has stipulated that the STB may in no case "set a price which is below the fair market value of the line (*including, unless otherwise mutually agreed, all facilities on the line or portion necessary to provide effective transportation services*)." § 10904(f)(1)(B) (emphasis added). Most significantly, owners of railroad lines purchased under § 10904 are prohibited from "transfer[ring] or *discontinu[ing]* service on such line prior to the end of the second year after consummation of the sale ...." § 10904(f)(4)(A) (emphasis added). This provision would be moot unless Congress envisioned that lines acquired through OFAs would remain in service. Contrary to RIRPA's assertion otherwise, the plain language of § 10904 does not require us to find that Congress has wholly repealed the former OFA provision; § 10904, in fact, read as a whole, is reconcilable with its predecessor as both versions underscore the aim of sustaining rail service. *Cf. Chase v. United States*, 256 U.S. 1, 9, 41 S.Ct. 417, 65 L.Ed. 801 (1921) (reasoning that a 1912 act regarding unallotted lands on the Omaha Indian Reservation superseded a predecessor statute "though it contains no repealing words" as "both acts cannot be carried out").

■ The legislative history further erodes RIRPA's argument:

[§ 10904], which replaces former section 10905, governs so-called "forced sales" of lines proposing for abandonment. The new provision retains the procedure under which the agency screens potential offerors for fitness and, if specified conditions are met, sets the price for the sale of the line proposed for abandonment. The new provision eliminates the alternative (and rarely utilized) process for forcing continued operation of a line through use of a shipper or another non-rail party's continued operation of a line through use of a shipper or other non-rail party's subsidy, of its operation.

H.R. Conf. Rep. 104–422, 1995 WL 767862 (Leg.Hist.) (1995). *See West Coast Truck Lines, Inc. v. Arcata Community Recylc-*

*ing Ctr., Inc.*, 846 F.2d 1239, 1242 (9th Cir.1988) (explaining that congressional intent may be gleaned from the legislative history). If, as recorded in the Conference Report, Congress intended to retain the procedure outlined in § 10905 (the former § 10904) for evaluating fitness, the STB must consider whether the financial assistance being offered will enable rail transportation to be continued. Also persuasive here is the fact that Congress explicitly signaled the substantive change it was making to the subsidy procedures. In light of this acknowledgment with respect to subsidies, we find it highly implausible that Congress would eliminate the original aim of the OFA procedure without clearly expressing its intent do so. *See United States v. Ryder*, 110 U.S. 729, 739–40, 4 S.Ct. 196, 28 L.Ed. 308 (1884) ("The revisers would not have proposed, nor would Congress have made, such a fundamental change in the law ... without employing more appropriate terms for that purpose than those which the section contains."). "Under established canons of statutory construction, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.'" *Finley v. United States*, 490 U.S. 545, 554, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (quoting *Anderson v. Pacific Coast S.S. Co.*, 225 U.S. 187, 199, 32 S.Ct. 626, 56 L.Ed. 1047 (1912)).

RIRPA makes a number of other arguments which, in light of our conclusion that the STB's reading of § 10904 is not reasonable, are rendered irrelevant. We will, however, address RIRPA's meritless contention that the STB's decision here is contrary to the agency's case law. The STB has been consistent in continuing to require that an OFA "be for continued rail service on a line that otherwise would be abandoned and that the offeror be financially responsible." *Union Pac. R.R. Co.—Abandonment Exemption—in Rio Grande and Mineral Counties, CO in the Matter of an Offer of Fin. Assistance*, STB Docket No. AB–33 (Sub–No. 132X) (served

May 11, 1999). STB decisions also offer a reasonable explanation of the basis on which it has retained "continuation of rail service" as a criterion although § 10904 does not contain the phrase. In the same decision on which RIRPA bases its argument, *Abandonment and Discontinuance of Rail Lines and Rail Transp. Under 49 U.S.C. 10903*, STB Ex Parte No. 537 (served Dec. 24, 1996 and June 27, 1997), the STB notes that a goal of the new OFA procedure is to expedite the approval process where possible. In light of this goal, the STB has explained that it will presume that the offeror of financial assistance is capable of operating the line for at least two years: "Once a finding is made that an offeror is financially responsible to fulfill its contractual responsibilities, its capability to conduct operations for 2 years is presumed in the absence of evidence to the contrary...." *Consolidated Rail Corp.— Abandonment Exemption—in Bergen and Passaic Counties, NY*, STB Docket No. AB–167 (Sub–No. 1151X) (served Oct. 30, 1997). A presumption of continuation of service should not, however, be confused with the elimination of it as a criterion in the OFA approval process.

We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. 2778. Our review is limited to whether the STB's reading of § 10904 is "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In light of this deferential standard, we hold that the STB's interpretation of § 10904 as authorizing it to reject OFAs which are not intended to enable the continuation of rail transportation is reasonable. RIRPA's first claim therefore fails.

### III. DECISION UNDER REVIEW

Our next inquiry is whether, as RIRPA contends, the STB's decision to reject its OFA is arbitrary and capricious. In making this determination, our role is limited to evaluating whether the STB engaged in reasoned decisionmaking and if its decision is adequately explained and supported by the record. *See Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 573 (9th Cir.1998). Under this standard, we look only to see whether there has been a clear error of judgment. *See id.*

Most significantly, RIRPA argues that the STB failed to distinguish the decision here from its ruling in *Illinois Cent. R.R. Co.—Abandonment Exemption—in Perry County, IL*, STB Docket No. AB–43 (Sub–No. 164X) (served Nov. 8, 1994), wherein it held that recent actual service is not required for OFA approval. In *Perry County*, the ICC considered an OFA, submitted by Freeman United Coal Mining Company ("Freeman"), to purchase a 6.2 mile line being abandoned by the Illinois Central Railroad Company ("Illinois Central") due to low demand for coal and expiration of long-term supply contracts. Freeman owned a coal mine at the terminus of the line and wanted to preserve rail freight service pending the return of favorable market conditions. Illinois Central opposed the OFA, arguing that the line had been inactive for three years. While acknowledging Illinois Central's opposition, the ICC countered that it had never required recent actual service for OFA approval and explained that its role was to preserve the potential for transportation. The ICC therefore approved the OFA based on its finding that Freeman was offering to subsidize the line with a view to securing it for rail purposes in order to tender coal for transport as soon as it had coal to offer.

The STB, in denying RIRPA's OFA, distinguished the instant case from *Perry County* on the facts:

> RIRPA's reliance on *Perry County* is misplaced. There, the owner of an inactive coal mine was willing to make payments to the railroad to preserve a line from which the mine owner received no immediate benefit whatever. The offer-

or's willingness to do so manifested a strong intent to use the line for rail service in the future if the mine were again to become active. No other reason existed for the mine's owner to make the payments. *Here, there is no evidence to suggest that RIRPA has a similar interest in acquiring the line to preserve the line for future rail service. The issue is not whether service is currently being provided, but whether the circumstances in their entirety indicate that the financial assistance is being offered for rail service.* The evidence in *Perry County* indicated that the answer was yes. The evidence here indicates that the answer is no.

*Offer of Fin. Assistance* at 11 (emphasis added). The STB was persuaded by the evidence suggesting that RIRPA submitted the OFA in order to frustrate the development of a recreational trail on the right of way, taking into account newspaper articles in which RIRPA's leadership made statements indicating that the organization's primary interest in purchasing the line was to preserve its members' privacy. *See Offer of Fin. Assistance* at 7. RIRPA's organizational purpose, although a factor in the STB's decision, was not however dispositive. The critical factor, and the basis for the OFA's rejection, was the STB's determination that future traffic on the line was highly, if not totally, unlikely.

▪ The sole shipper to have used the Redmond–Issaquah line directly prior to BNSF suspending operations stated that it was not interested in rail service. *See id.* at 8. Statements submitted by the four shippers expressing interest in using the line for rail transportation also prompted the STB to conclude that future traffic was speculative at best: none of the companies had ever shipped or received traffic over the line; two of the companies shipped manufactured goods which are rarely transported by rail; there were no

established agreements as to what the transportation rates would be; there were no commitments to use the line for transportation; the statements of interest were perfunctory; and transportation of goods by rail would be inefficient and expensive for these shippers. *See id.* at 8–9. In addition, the STB determined that the cost to rehabilitate the Redmond–Issaquah line would be substantial. *See id.* at 9–10.

Unlike in *Perry County,* then, the STB here concluded that there was no potential for future traffic and that RIRPA was not interested in offering rail service. As it is the STB's exclusive province to draw legitimate inferences from the evidence, *see Ralston Purina Co. v. Louisville & Nashville R.R. Co.,* 426 U.S. 476, 477–78, 96 S.Ct. 2160, 48 L.Ed.2d 781 (1976), and because its decision was based on a sensible consideration of the relevant factors, *see Morongo Band of Mission Indians,* 161 F.3d at 573, we find the STB's rejection of the OFA to be reasonable.

The STB's decision to deny RIRPA's OFA is AFFIRMED.