FOREST GUARDIANS, a nonprofit corporation; White Mountain Conservation League, Plaintiffs–Appellants,

v.

UNITED STATES FOREST SERVICE; Ann M. Veneman, in her capacity as Secretary of Agriculture of the United States,* Defendants–Appellees.

No. 01–15066.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2002.

Filed May 27, 2003.

---

* Ann M. Veneman is substituted for her predecessor, Daniel Glickman, as Secretary of Agriculture. Fed. R.App. P. 43(c)(2).

James S. Angell and Marie A. Kirk, Earthjustice Legal Defense Fund, Denver, Colorado, for the plaintiffs-appellants.

Katherine W. Hazard, Department of Justice, Washington, D.C., for the defendants-appellees.

Before: WALLACE, KOZINSKI and PAEZ, Circuit Judges.

Opinion by Judge WALLACE. Opinion concurring in part and dissenting in part by Judge PAEZ.

## OPINION

WALLACE, Senior Circuit Judge:

Forest Guardians and the White Mountain Conservation League (collectively, Forest Guardians) appeal from a summary judgment in favor of the United States Forest Service (Service) regarding the Service's adoption of certain measures relating to cattle grazing on land in the Apache–Sitgreaves National Forest. The district court had jurisdiction over the claims pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g). We have jurisdiction over Forest Guardians' timely appeal pursuant to 28 U.S.C. § 1291. After the briefs were filed, but before argument was heard, the Service filed a motion notifying the court that intervening events rendered moot some of Forest Guardians' claims. After oral argument, Forest Guardians filed its response to the mootness motion. We dismiss in part and affirm in part.

### I.

The Service is currently responsible for managing the 191 million acres of land in the National Forest System. The Apache–Sitgreaves National Forest is managed by the Southwest Region of the Service and is located in the central eastern portion of Arizona that is bordered by New Mexico.

The Service administers the National Forest System, including the Apache–Sitgreaves National Forest, under the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976, 16 U.S.C. § 1600 et seq. (NFMA), and the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. §§ 528–531 (MUSYA). The Service also promulgates its own regulations regarding forest management in the Code of Federal Regulations.

The Service makes forest management decisions by developing a Land and Resource Management Plan (Forest Plan) for each unit of the National Forest System. The Service then implements the Forest Plan by approving or disapproving site-specific actions. The NFMA and service regulations require that proposed actions be consistent with the Forest Plan. 16 U.S.C. § 1604(I).

In developing a Forest Plan, the Service is required to "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with [the MUSYA] and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness ...." 16 U.S.C. § 1604(e)(1). The NFMA also requires

the Service to consider the "economic and environmental aspects of various systems of renewable resource management." 16 U.S.C. § 1604(g)(3)(A). In addition, a Forest Plan must comply with the National Environmental Policy Act of 1960 (NEPA), which requires the Service to prepare an environmental impact statement for every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). Service actions must also comply with the Endangered Species Act (ESA), which requires consultation with the Fish and Wildlife Service to ensure that any action by the Service "is not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification" of a designated critical habitat. 16 U.S.C. § 1536(a)(2).

The Service issued a Forest Plan for the Apache–Sitgreaves National Forest in 1987, and amended the Plan in 1989, 1990, 1991, 1992, and 1996. The Forest Plan, in accordance with MUSYA, provided for grazing of livestock on certain portions (allotments) of forest land. In 1996, the Service began to develop Allotment Management Plans (AMPs) for six grazing allotments in the forest. The "Red Hill" and "Grandfather" allotments (hereinafter, Red Hill) were evaluated together in one administrative process, while the Cow Flat, Foote Creek, PS and Stone Creek allotments (hereinafter, Cow Flat) were evaluated together in another. The purpose of the two AMPs was to determine whether livestock grazing should be authorized, and if so, what the appropriate management strategy would be. As then-current grazing capacity estimates indicated overstocking and overutilization of vegetation on the rangelands by both the livestock and wild ungulates (*i.e.*, hoofed animals such as deer, big horn sheep and elk), the Service concluded that the grazing permits had to be revised to comply with the Forest Plan and the applicable environmental laws.

After considering its options, the Service canceled existing permits on the Red Hill and Cow Flat allotments and issued new permits. In these new permits, the Service provided for a gradual three-year reduction of the number of cattle allowed to graze, allocated 100% of the available forage (*i.e.*, forage that can be consumed or trampled by any ungulate, wild or domesticated, without damage to the environment) to the cattle—and, therefore, not to the wild ungulates known to inhabit the allotments—and reserved the power to issue temporary permits to increase the number of grazing cattle to experiment with management strategy for the allotments.

Forest Guardians sued, alleging that the phased-in reduction, the allocation of all available forage to cattle, and the reserved power to experiment with range management through temporary permits all violate the consistency provision of the NFMA, because the Forest Plan requires balancing grazing capacity with use and environmental concerns. The Service, Forest Guardians alleges, failed to consider, as it must, the needs of the wild ungulates known to subsist on the allotments. It further alleges that the Service's actions violated a 1999 Biological Opinion (BO) in which the Fish and Wildlife Service determined that unless cattle grazing was significantly reduced and harmonized with use by wild ungulates, the resulting overuse would result in a "take" of the loach minnow and the Mexican spotted owl in violation of sections 7 and 9 of the ESA. A "take" occurs when a species listed by the Fish and Wildlife Service as "endangered" is killed, or its habitat is so threatened that members of the species will die, in violation of the terms of the Fish and Wildlife Service's consultation with the offending agency.

On appeal, Forest Guardians challenges the district court's summary judgment in favor of the Service on these claims. It also challenges the district court's refusal to admit monitoring evidence gathered in 2000 that demonstrates overgrazing on the Red Hill and Cow Flat allotments, arguing that its claims under the ESA are not limited to administrative record review.

## II.

Before addressing the merits of Forest Guardians' claims, we must consider whether some of those claims are now moot. The Service argues (A) that the validity of the phased-in reduction scheme is moot because the three-year period for both allotment groups (Red Hill and Cow Flat) ended on or before March 1, 2002; (B) that the validity of the temporary permit power was mooted by the Service's issuance of a Decision Notice indicating its intent to use its temporary permit power only in accordance with the Service's Manual (mirroring the regulation at 36 C.F.R. § 222.3(c)(2)(I)); and (C) that all of Forest Guardians' ESA sections 7 and 9 claims with respect to the loach minnow and the Mexican spotted owl are moot because they are based on a 1999 BO that has been superseded, or in the alternative, that the section 7 claim is moot because the Service has already reconsulted with the Fish and Wildlife Service, or that Forest Guardians failed to give adequate notice of the sections 7 and 9 claims to the agency in its intent to sue letter. We consider each argument in turn.

## A.

■ The Service first asserts that the phased-in reduction scheme is moot because the three-year period has ended. "Our cases, however, make clear that completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given." *Neighbors of Cud-dy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir.2002). A controversy remains live so long as effective relief is still available. *Id.* at 1066; *Cantrell v. City of Long Beach*, 241 F.3d 674, 678–79 (9th Cir.2001) (challenge to plan to develop naval station was not mooted by destruction of buildings on the site because "the defendants could consider alternatives to the current reuse plan, and develop ways to mitigate the damage to the birds' habitat"); *Northwest Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir.1988) (challenge to regulations governing 1986 salmon fishing season was not mooted by the close of the season because the damage could be mitigated "by allowing more fish to spawn in 1989"). If we conclude that the Service's phased-in reduction scheme violates the NFMA, the district court could order the Service to develop tactics to mitigate the damage caused by the violation, such as moving or removing livestock from the allotments so the land can repair itself. Thus, Forest Guardians' claim with respect to the phased-in reduction scheme remains live.

## B.

■ We now discuss the temporary permit power issue. Forest Guardians complained in its opening brief that the Service's Decision Notice indicated that the Service might issue temporary permits increasing livestock numbers to "determine if more intensive management could expand the lands' existing grazing capacity," even though "experimenting with management" is not one of the five regulatory circumstances in which the Service is authorized to issue temporary permits under 36 C.F.R. § 222.3(c)(2)(I). However, on January 3, 2002, after this case was filed but before argument was heard, the Service issued a "Clarification to Decision Notice" for the Red Hill and Cow Flat AMPs. This document expressly states that no

temporary permits will issue unless consistent with the policy and purpose of temporary grazing permits set forth in the Service Manual, which mirrors the regulation at 36 C.F.R. § 222.3(c)(2)(I). No temporary permits were ever issued to experiment with management options. We agree with the Service that the issue was no longer live once the defect was cured by the clarified Decision Notice.

■ Forest Guardians argues, however, that the issue falls within the voluntary cessation exception to the mootness doctrine. Voluntary cessation saves an issue from becoming moot if the defendant voluntarily stops the allegedly illegal conduct to avoid a judgment against him, unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), (quoting *United States v. Concentrated Phosphate Export Ass'n.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (internal quotation marks omitted)). Forest Guardians argues that it is far from "absolutely clear" that the agency will never pursue such improper temporary permits in the future because the original Decision Notice was not deleted (rather, it was "clarified"), the Service defended its original provision in the district court, and the district court agreed with the Service that it fit within one of the five proper bases for issuing a temporary permit. Forest Guardians asserts that there is no assurance in the clarification that the Service will not issue a temporary permit to experiment with management and then successfully argue to a district court that the permit is valid under one of the five proper bases.

While "[t]he burden of demonstrating mootness is a heavy one" in the face of a claim of voluntary cessation, *Los Angeles County v. Davis,* 440 U.S. 625, 631, 99

S.Ct. 1379, 59 L.Ed.2d 642 (1979) (internal quotation marks omitted), the Service has met its burden in this case. It is unreasonable to think that the Service would return to conduct it has admitted to this court is constitutionally deficient. *Carlson v. United Academics–AAUP/AFT/APEA AFL–CIO,* 265 F.3d 778, 786–87 (9th Cir. 2001). While the Service may not have "deleted" the offending Decision Notice as Forest Guardians would have liked, the clarification overrides it, and it is clear that the Service does not intend to (nor even think it could) return to the original policy. Furthermore, the Service has never attempted to exercise its apparent authority under the original provision. In light of the clarification and the Service's admission, it is fair to conclude that "it is absolutely certain" the Service will not in the future issue temporary permits to experiment with forest management options.

## C.

■ Next, we come to the Service's argument that the ESA sections 7 and 9 claims for the loach minnow and the Mexican Spotted Owl are moot because the underlying 1999 BO was superseded and therefore does not affect the new permits at issue in this case. Forest Guardians bases its section 7 claim on the principle that if an agency fails to implement key assumptions on which a BO was based, the agency is required to reinitiate consultation with the Fish and Wildlife Service under the ESA. *Sierra Club v. Marsh,* 816 F.2d 1376, 1387–88 (9th Cir.1987). It argues that the Service's ten-year permits do not meet the 1999 BO's assumptions. Forest Guardians bases its section 9 claims on the 1999 BO's explicit statement that the Service's failure to adhere to the forage utilization standards contained therein would cause an unlawful "take" of the loach minnow and the Mexican spotted owl.

In response, the Service argues that the alleged sections 7 and 9 violations are moot because the 1998 Biological Assessment and Evaluations (BAEs) superseded the 1999 BO. While this sounds implausible, the agency explains that "although the 1998 BAEs predate the 1999 BO, they nonetheless supersede the 1999 BO because the former covers the 10–year permits for the period of 2000–2009, whereas the 1999 BO covered a 3–year period beginning in 1998. The 1999 BO addressed livestock use on 22 grazing allotments.... Although the 1999 BO was begun before the ESA consultation for the new AMPs and permits, it took longer to complete than the [1998] BAEs which addressed proposed livestock use under the new permits and AMPs on only 6 allotments." The 1998 BAE concluded that the allowed grazing would have either "no effect" or was "not likely to adversely affect" the species listed under the ESA. The Fish and Wildlife Service concurred in a letter dated September 18, 1998, satisfying the consultation requirement. 50 C.F.R. 402(a).

In its defense of jurisdiction, Forest Guardians argues that its section 7 claim "alleges that the agency must reconsult because the permits are inconsistent with the relevant ESA consultation documents. The challenge, then is to the permits and not to any particular consultation document or process." While it is true that Forest Guardians' challenges the permits and not the 1999 BO, their challenge is unquestionably based on the 1999 BO. Forest Guardians alleges the Service violated the ESA because it violated assumptions made in the 1999 BO. We have recognized that when one BO supersedes another, a challenge to the superseded BO is moot. *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123–24 (9th Cir.1997). This is true even if the superseded BO originally covered a time period that included the date of the litiga-

tion. *See id.* at 1124. Although the challenge is not to the BO itself, the validity of the challenge necessarily rises or falls with the validity of the BO. Because the 1998 BAE, which controls, does not contain the assumptions as to forage utilization on which Forest Guardians bases its claim, the section 7 claim based on the 1999 BO is moot.

The section 9 claim is also moot because it is based on incidental take statements that accompanied the 1999 BO. Since the 1998 BAE supersedes the 1999 BO, and is not accompanied by incidental take statements, Forest Guardians' claim under section 9 of the ESA that the Service has violated the terms of the incidental take statements is moot.

Because we hold that Forest Guardians' sections 7 and 9 ESA claims are moot, we do not address the Service's alternative argument that we are jurisdictionally barred from hearing those claims because Forest Guardians' notice of intent to sue letter mentioned the 1999 BO and not the 1998 BAE. *See Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir.1998) (notice of intent to sue letters are jurisdictional). Nor do we address the Service's argument that the section 7 claim is moot because it has already reconsulted with the Fish and Wildlife Service.

Because the sections 7 and 9 claims were moot when they were brought, its additional claim that post–June 1, 1999 monitoring data should have been admitted is also moot.

### III.

 We review de novo Forest Guardians' remaining challenges to the district court's summary judgment upholding the agency decision. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1376 (9th Cir.1998). Agency

actions challenged under the NFMA and the ESA may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.* (NFMA); *Sierra Club v. Babbitt,* 65 F.3d 1502, 1507 (9th Cir.1995) (ESA); 5 U.S.C. § 706(2)(A). In determining whether an agency's action is arbitrary or capricious, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Morongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 573 (9th Cir.1998) (internal quotation marks and citation omitted). We may not substitute our judgment for that of the agency. *Id.*

Moreover, the Service is entitled to substantial deference to its interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Indeed, judicial review of an agency's interpretation of its own regulations is limited to ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation. *Vincent v. Apfel,* 191 F.3d 1143, 1148 (9th Cir.1999).

### IV.

Forest Guardians contends that the phased-in reduction scheme included in the ten-year grazing permits violates the NFMA because it is not "consistent" with the Apache–Sitgreaves Forest Plan. The district court held that the phase-in scheme was permitted by 36 C.F.R. § 222.4(a)(8), which requires one year's notice to permittees regarding changes in permitted livestock numbers. We conclude that this was not a proper basis upon which to uphold this aspect of the grazing permits. Section 222.4(a)(8) expressly authorizes the Service to *"[m]odify"* the number of livestock allowed (emphasis added). However, the Service did not "modify" the permits in question; rather, it cancelled the old permits and issued new ones. Section 222.4(a)(8) and the requirement of one year's notice to the permittee therefore does not apply in this case.

But we are free to affirm the district court on *any* ground supported by the record and briefed by the parties, and we are not limited to reviewing the district court's stated basis for its decision. *United States v. Gonzalez–Rincon,* 36 F.3d 859, 866 (9th Cir.1994). We conclude that the phased-in reduction scheme is permitted by the regulations and is consistent with the Forest Plan. New permits are governed by 36 C.F.R. § 222.3, which gives the Service broad authority to issue permits with "[u]pper and special limits governing the total number of livestock for which a person is entitled to hold a permit." *Id.* § 222.3(c)(1)(vi)(E). The phased-in reduction scheme is thus a permitted limit on the number of livestock a permittee can graze on his allotment.

Furthermore, the scheme does not violate the Forest Plan's requirement that capacity and permitted use be balanced, nor does it impermissibly rely on permittee hardship for justifying the phased-in reduction scheme. The Service is required by federal law to consider the use of National Forest lands for grazing of livestock, 16 U.S.C. § 531 (MUSYA) and 16 U.S.C. § 1604(e)(1) (NFMA), and to develop AMPs "in careful and considered consultation, cooperation and coordination with the lessees, permittees, and landowners involved . . . ." 43 U.S.C. § 1752(d) (Federal Land Policy and Management Act). The Service's decision to make drastic reductions in the number of permitted livestock over a less onerous three-year period, rather than implementing an immediate reduction, is consistent with these requirements.

When determining whether the phased-in reduction is consistent with the Forest Plan, we are not permitted to analyze the issue in a vacuum. Instead, federal courts are required to defer to an agency's reasonable interpretation of its own guidelines, *Thomas Jefferson*, 512 U.S. at 512, 114 S.Ct. 2381, and the Service's decision can be overturned only if the phased-in reduction scheme is plainly erroneous or inconsistent with the Forest Plan. *Vincent*, 191 F.3d at 1148. We hold the phased-in reduction scheme is a reasonable response to the Forest Plan's requirement that capacity and permitted use be balanced, and the Service's burden to consider the permittees when making management decisions. While the Service admits that overgrazing occurred in the past, this history does not condemn the future. In response to the past overgrazing, the Service reduced livestock numbers, cancelled old permits and issued new ones. In the process, it considered the needs of the permittees, as it was required to do. We conclude that this was a reasonable interpretation of the Forest Plan, and therefore was not arbitrary, capricious, or otherwise not in accordance with the law.

## V.

Forest Guardians also argues that the allocation of 100% of available forage to livestock violates the NFMA because the decision is not consistent with the Forest Plan. The Service admits it knew that elk and deer graze the Red Hill and Cow Flat allotments. Nevertheless, the Service set the livestock numbers on each allotment based on an allocation of all available forage to livestock. Forest Guardians argues that because the Forest Plan requires the Service to consider the needs of neighboring wildlife, the Service cannot allocate 100% of available forage to grazing livestock.

Despite the allocation of all available forage to grazing livestock, the Service does consider ungulate use in determining the actual period the livestock may use the range. The Service actively monitors forage use and can prohibit or remove livestock from a pasture regardless of scheduled grazing periods for each pasture and regardless of the number of livestock on each pasture. *See* Decision Notice and Finding of No Significant Impact, Allotment Management Plan (Red Hill and Grandfather allotments). The pastures are checked before the livestock enter and again approximately halfway through the grazing period. Forage use by all ungulates is monitored and projected use is calculated to determine when the livestock must be moved. Thus, the actual number of livestock grazing will depend on climactic conditions, wild ungulate populations, and other factors. Because agency actions challenged under the NFMA may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, *Neighbors of Cuddy Mountain*, 137 F.3d at 1376; 5 U.S.C. § 706(2)(A), we disagree with Forest Guardians that the Service's decision to allocate 100% of available forage to grazing livestock violates the NFMA. Based on the record before us, the Service's actions do not reflect "a clear error of judgment." *Morongo Band of Mission Indians*, 161 F.3d at 573.

Forest Guardians rebuffs the idea that monitoring can save the allocation decision from illegality because, it contends, monitoring cannot be considered in setting grazing capacity by the terms of the Forest Plan. Forest Guardians points to the Forest Plan's definition of several terms to support its argument: "grazing capacity" is the "maximum stocking rate possible without inducing damage to vegetation or related resources"; "stocking rate," in turn, is defined as "the number of specific

kinds and classes of animals grazing or utilizing a unit of land for a specified time"; and "overstocking" is "[p]lacing a number of animals on a given area that will result in overuse if continued to the end of the planned grazing period." Forest Guardians reminds us that the planned grazing period at issue here is the ten-year duration of the grazing permits, and that the Service has granted permission for enough livestock to graze or trample 100% of the available forage, without considering wild ungulates. It therefore contends monitoring is irrelevant.

However, because the Service's interpretation of the Forest Plan to allow for maximum allocation to livestock with adjustments based on monitoring is neither plainly erroneous nor inconsistent with the regulation, it is accorded substantial deference. *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381; *Vincent,* 191 F.3d at 1148. As the Service explained, and Forest Guardians conceded, it is very difficult to estimate climactic changes or to assert with any confidence how the wild ungulate population will change. The Service works with the Arizona Department of Game and Fish to estimate the number and movement of wild ungulate populations, and it takes part in a joint analysis of carrying capacity and management strategies based on allowable game hunting. Requiring the Service to come up with a single estimate that can cover a ten-year time period would be unreasonable, if not pure folly. Therefore, the reading of the Forest Plan's definitions section advanced by Forest Guardians is not compelled, and the Service's interpretation of those definitions is not plainly erroneous.

 Forest Guardians argues that the Service's monitoring program is itself an arbitrary and capricious action with respect to range management and therefore cannot ameliorate the allocation of all grazing capacity to livestock. Despite monitor-

ing programs in the past, the land in the Red Hill and Cow Flat allotments has been over grazed. Forest Guardians therefore calls the monitoring plan "a proven failure," and asserts that the Service cannot rely on it as part of its management strategy.

 The monitoring program is not an arbitrary or capricious action on the part of the Service. The Service "articulated a rational connection between the facts found and the choice made." *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of the Navy,* 898 F.2d 1410, 1414 (1990) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). Recognizing past overgrazing, the Service maintained its efforts to monitor the use of the land, a rational decision given that wild ungulate populations and their effects on the land are extremely difficult to predict. "When the agency is making predictions, within its special expertise, at the frontiers of science," we must be at our most deferential. *Cent. Ariz. Water Conservation Dist. v. EPA,* 990 F.2d 1531, 1539–40 (9th Cir.1993) (quoting *Baltimore Gas & Elec. Co.,* 462 U.S. at 103, 103 S.Ct. 2246) (internal quotation marks omitted). It was rational for the Service to conclude that, although there had been failures in the past, monitoring was the only way to effectively predict wild ungulate use of the land. The past failure of monitoring to prevent overgrazing does not change this result, because there is no evidence that the monitoring program itself was the but-for cause of that overgrazing. An agency's actions need not be perfect; we may only set aside decisions that have no basis in fact, and not those with which we disagree. *Bureau of Indian Affairs v. FLRA,* 887 F.2d 172, 176 (9th Cir.1989). Thus, even if we were to conclude that the Service could develop

a better system of predicting wild ungulate use, or even preventing overgrazing, we are not permitted to substitute our judgment for the agency's. *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir.2000) ("we may not substitute [our] judgment for that of the agency and must simply ensure that the agency has adequately considered and disclosed the environmental impact of its actions" (internal quotation marks omitted)).

We therefore conclude that allocating available forage to livestock and monitoring the use of the land is consistent with the Forest Plan, and is neither arbitrary nor capricious.

## VI.

In accordance with the above conclusions, Forest Guardians' claims with respect to the temporary permits, alleged violations of sections 7 and 9 of the Endangered Species Act, and the refusal of the District Court to admit post-June 1, 1999 monitoring data, are DISMISSED as moot. The District Court's summary judgment in favor of the Service with respect to the allocation of available forage to grazing domestic livestock, the monitoring program, and the phased-in reduction scheme is AFFIRMED.

PAEZ, Circuit Judge, concurring in part, dissenting in part:

I concur in the all of the majority's opinion except section V. I respectfully dissent from the majority's holding in section V that the Forest Service ("Service") complied with the Forest Plan when it allocated 100 percent of the available forage to livestock and relied on monitoring to help determine grazing capacity. In my view, the Service's Allotment Management Plan did not comply with the Forest Plan and therefore violated the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1600 *et seq.* *See* 16 U.S.C. § 1604(I) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.10 ("All site-specific decisions, including authorized uses of land, must be consistent with the applicable plan.").

According to the Forest Plan, the Service was obligated to consider the grazing needs of wild ungulates in determining the amount of forage available for livestock grazing. For example, the Plan states: (1) "The needs of wildlife will be considered when establishing livestock grazing capacity"; (2) "Allotment management plans will recognize that domestic livestock may compete with big game animals (e.g. elk, deer, antelope) for available forage on some rangelands"; and (3) "Allow sufficient forage to accommodate wildlife, unless doing so would be inconsistent with multiple-use principles or with the Forest Plan." By allotting 100 percent of available forage to livestock, the Service failed to comply with these provisions of the Forest Plan, and thus violated the NFMA. *See Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059, 1070–71 (9th Cir.1998) (holding that Service violated the NFMA "by failing to make the proposed timber sale consistent with the procedural provisions of the Tongass Land Management Plan"); *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1377–78 (9th Cir.1998) (holding that Service was not in compliance with the NFMA where its site-specific project was inconsistent with the land resource management plan of the entire forest).

The majority opinion concludes that "the Service's interpretation of the Forest Plan to allow for maximum allocation to livestock with adjustments based on monitoring is neither plainly erroneous nor inconsistent with the regulation...." I re-

spectfully disagree. Under the Forest Plan, the Service must "[b]alance grazing capacity and permitted use." It does so by performing a "basic allotment analysis" that evaluates "grazing capability." "Grazing capability," or "capacity," is defined as the "maximum stocking rate possible without inducing damage to vegetation or related resources." "Stocking rate" in turn refers to the "actual number of animals . . . on a specific area at a specific time." The Service's regulations require that grazing permits specify the maximum number of cattle that can graze on the allotment and the period of the year during which the property is capable of supporting this number of cattle. *See* 36 C.F.R. §§ 222.3(c)(1)(vi)(B) & (E). These regulations and the Forest Plan make clear that the Service must determine the maximum "stocking rate" and "grazing capacity"—*i.e.*, how many livestock *and* wild ungulates can graze on the land without damaging vegetation or related resources—*prior to* issuing the grazing permits.

Neither the Forest Plan nor the Service's regulations discusses the need for monitoring to measure the "stocking rate" or the "grazing capacity." Under the Forest Plan, monitoring has a specific purpose: "Perform utilization studies . . . as needed to monitor *accomplishment* of stated multi-use objectives" (emphasis added). This language suggests that the Service should use monitoring to assess the allotments *after* it has determined their grazing capacity, and should not use monitoring to determine grazing capacity. *See Morrison,* 153 F.3d at 1069 (rejecting the Service's argument "that it was not required to conduct an area analysis prior to the project-specific EIS" and "that the two steps may be conducted simultaneously" and noting that "an agency's interpretation [of its own regulations] does not control, where, as here, it is plainly inconsistent with the regulation at issue").

Accordingly, I conclude that allocating available forage to livestock and monitoring use of the land is inconsistent with the Forest Plan and is arbitrary and capricious. I therefore would reverse the district court's judgment to the extent it is inconsistent with this conclusion.